# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-1500

_____

United States of America

*Plaintiff - Appellee*

v.

Randeep Mann

*Defendant - Appellant*

_____

No. 11-2187

_____

United States of America

*Plaintiff - Appellee*

v.

Randeep Mann

*Defendant - Appellant*

———————————

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

———————————

Submitted: February 8, 2012
Filed: December 6, 2012

———————————

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

———————————

SHEPHERD, Circuit Judge.

Randeep Mann was convicted by a jury of conspiring to use and aiding and abetting in the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a; causing the damage or destruction of a vehicle by means of an explosive resulting in personal injury in violation of 18 U.S.C. § 844(i); possession of unregistered grenades in violation of 26 U.S.C. § 5861(d); possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d); possession of a machinegun in violation of 18 U.S.C. § 922(o); conspiring to corruptly obstruct an official proceeding in violation of 18 U.S.C. § 1512(k); and aiding and abetting in the corrupt concealment of documents with the intent to impair the use of the documents in an official proceeding in violation of 18 U.S.C. § 1512(c)(1)-(2). Mann appeals his convictions and his sentences. We affirm in part, reverse in part, and remand for resentencing.

## I. Introduction

On February 4, 2009, Dr. Trent Pierce, Chairman of the Arkansas State Medical Board (the Board), left his home in West Memphis, Arkansas, planning to

drive later that day to Little Rock, Arkansas, to attend a Board meeting. Before getting into his vehicle, Dr. Pierce noticed a spare tire leaning against his vehicle. When he attempted to move the tire, it exploded, rendering Dr. Pierce severely and permanently injured. Investigators determined that the explosion was caused by a bomb composed of the spare tire and an MK3A2 hand grenade.

In its investigation of the bombing, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) asked the Board for a list of doctors who had been disciplined by the Board in the previous five years. The Board supplied the list of disciplined doctors to the ATF. The list included Mann—who had a long history of disciplinary actions before the Board—and four other physicians.

Because Mann's name was on the list supplied by the Board, ATF agents interviewed Mann and his wife, Sangeeta, at their residence in Russellville, Arkansas, on the evening of the bombing. During that interview, Mann mentioned to the agents that he had a collection of guns and a federal firearms license and offered to show the agents his collection. The agents observed that one of Mann's guns was equipped with an M203 grenade launcher.

By chance, on March 3, 2009, city workers discovered 98 40mm High Explosive (HE) M406 grenades and a practice grenade buried in a wooded area approximately 875 feet from the Manns' residence. The grenades were enclosed in a green military ammunition canister and were capable of being launched by an M203 grenade launcher like the one owned by Mann.

The following day, officers obtained and executed a search warrant on the Manns' residence looking for evidence connected to the 98 buried grenades. Officers seized five green military canisters from Mann's home that were similar to the canister that contained the buried grenades. One of the five canisters contained the

same lot number as the buried canister. Officers also seized 46 practice grenades similar to the buried practice grenade, a manual for a 40mm grenade launcher, a hand grenade manual, 18 firearms, and a 40mm grenade launcher. Officers determined that the 98 buried grenades and 2 of the firearms were not registered to Mann as required by federal law, and Mann was arrested for ownership of unregistered grenades.[1]

On March 5, 2009, Mann appeared in federal court at an initial appearance on a complaint charging him with unlawful possession of one or more unregistered firearms. On the evening of March 5, 2009, agents executed a second search warrant on the Manns' residence to search for evidence relating to the bombing of Dr. Pierce. Between Mann's initial appearance and his detention hearing, Mann was held in federal custody. Phone conversations between Mann and his wife were recorded, in which Mann's wife informed Mann of the search of their home and of a pending search of Mann's medical office. Mann instructed his wife to remove certain documents from his office prior to the search.

Mann's detention hearing was held on March 9 and 10, 2009, and Mann was detained until trial. A grand jury returned an indictment on April 8, 2009, charging Mann with one count of possession of 98 unregistered grenades. The grand jury returned a superseding indictment on August 6, 2009, that added counts for possession of a machinegun, possession of an unregistered machinegun, possession of an unregistered shotgun, and two counts for obstruction of justice. On January 6, 2010, the grand jury returned a second and final superseding indictment that alleged several counts against Mann: Count 1, using and conspiring to use a weapon of mass destruction against a person or property within the United States in violation of 18 U.S.C. § 2332a; Count 2, aiding and abetting in the damaging or destruction of a

_____

[1]The jury later found that Mann legally possessed one of the two unregistered firearms.

vehicle used in an activity affecting interstate commerce by means of an explosive in violation of 18 U.S.C. § 844(i); Count 3, possession of unregistered grenades in violation of 26 U.S.C. § 5861(d); Count 4, possession of an unregistered shotgun in violation of 26 U.S.C. § 5861(d); Count 5, possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d); Count 6, possession of a machinegun in violation of 18 U.S.C. § 922(o); Count 7, conspiring to corruptly obstruct, influence, and impede an official proceeding in violation of 18 U.S.C. § 1512; and Count 8, aiding and abetting in the corrupt concealment of certain documents with the intent to impair the use of the documents in an official proceeding in violation of 18 U.S.C. § 1512. The indictment also alleged counts of obstruction of justice against Sangeeta Mann.[2]

Jury selection began on July 6, 2010, and the Manns' trial lasted roughly five weeks, including jury selection and deliberation. The jury convicted Mann on seven of eight counts, finding him not guilty of Count 4, possession of an unregistered shotgun, but finding him guilty on all other charges. The district court held a sentencing hearing on February 28, 2011, and sentenced Mann to life imprisonment on Count 1 (the weapons of mass destruction charge); 360 months on Count 2 (the arson charge); 120 months on Counts 2, 5, and 6 (the firearms offenses); and 60 months on Counts 7 and 8 (the obstruction of justice offenses), with all sentences to run concurrently.

Mann appeals his convictions and his sentences, alleging errors at the pretrial stage, at trial, and at sentencing.

---

[2]This Court's opinion affirming Sangeeta Mann's convictions can be found at United States v. Mann, 685 F.3d 714 (8th Cir. 2012).

## II. Pre-Trial

### *A. Speedy Trial*

Mann alleges the district court erred in not granting his motion to dismiss the original indictment with prejudice because the indictment was not filed within the time limits required by the Speedy Trial Act, 18 U.S.C. § 3161(b). Mann's argument involves a question of statutory interpretation; thus, we review the district court's decision de novo. Dunham v. Portfolio Recovery Assocs., LLC, 663 F.3d 997, 1001 (8th Cir. 2011); see also United States v. Orozco-Osbaldo, 615 F.3d 955, 957 (8th Cir. 2010) ("In the context of Speedy Trial Act rulings, we review a district court's legal conclusions de novo . . . .") (internal quotation marks omitted).

Mann was arrested on March 4, 2009; his first appearance on the complaint was March 5, 2009; and the grand jury returned the original indictment on April 8, 2009. Between his arrest on March 4 and the return of the indictment on April 8, more than 30 days passed, and Mann was detained for the entirety of that time. The Speedy Trial Act requires that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). However, where an individual is "in a district in which no grand jury has been in session during such thirty-day period, the period of time for filing of the indictment *shall be* extended an additional thirty days." 18 U.S.C. § 3161(b) (emphasis added).

It is undisputed on appeal that no grand jury was in session during the thirty-day period following Mann's first appearance on the complaint. However, Mann argues that in order for the Government to be entitled to the additional thirty days, the

Government was required to make a motion for an extension of time, which the Government did not do.

The district court denied Mann's motion to dismiss the indictment, finding the thirty-day period is automatically extended in the absence of a grand jury, regardless of whether the Government makes a motion to that effect. We agree.

Whether 18 U.S.C. § 3161(b) requires a Government motion to extend the thirty-day period is an issue of statutory interpretation. When interpreting a statute, we first look to its plain language. See Dunham, 663 F.3d at 1001. We "examine the text of the statute as a whole by considering its context, object, and policy." Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" United States v. I.L., 614 F.3d 817, 820 (8th Cir. 2010) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)).

The plain language of section 3161(b) is unambiguous: where a grand-jury is not in session during the thirty-day period, "the period of time for filing of the indictment shall be extended an additional thirty days." 18 U.S.C. § 3161(b). Pursuant to the language of the statute, the extension of time is automatic; no Government motion is required. See United States v. Davis, 785 F.2d 610, 613 n.3 (8th Cir. 1986) (stating the Government does not bear the burden of demonstrating an extension of time was warranted and implying the extension is automatic where no grand jury is in session). We agree with the district court that Mann is entitled to no relief under the Speedy Trial Act.

*B. Double Jeopardy*

Next, Mann argues the district court erred in denying his motion to strike either Count 1 or Count 2 and either Count 5 or Count 6 from the second superseding indictment on grounds that the counts were multiplicious. "A multiplicious indictment is one charging the same offense in more than one count." United States v. Sue, 586 F.2d 70, 71 n.1 (8th Cir. 1978) (per curiam) (quoting United States v. Hearod, 499 F.2d. 1003, 1005 (5th Cir. 1974) (per curiam)). "'The principal danger raised by a multiplicious indictment is the possibility that the defendant will receive more than one sentence for a single offense.'" Id. at 72 (citation omitted). That is, a multiplicious indictment violates a defendant's "right not to be put more than once in jeopardy." United States v. Herzog, 644 F.2d 713, 715 (8th Cir. 1981). "A double jeopardy claim is a legal question that this court reviews de novo." Students for Sensible Drug Policy Found. v. Spellings, 523 F.3d 896, 899 (8th Cir. 2008).

When determining for double jeopardy purposes whether a defendant may be charged with violating multiple statutes on the basis of a single criminal act, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932).

Count 1 alleged Mann aided and abetted another in violating 18 U.S.C. § 2332a, which required proof that: (1) a weapon of mass destruction was used, (2) against any property within the United States, and (3) that the offense affected interstate commerce. See 18 U.S.C. § 2332a(2)(D).[3] Count 2 alleged Mann aided and

_____

[3]It is unclear whether the statute's requirement that the weapon be used without lawful authority is an element of the offense or an affirmative defense. See United States v. Wise, 221 F.3d 140, 148 (5th Cir. 2000). We decline to entertain that

-8-

abetted another in violating 18 U.S.C. § 844(i), which required proof that Mann: (1) maliciously, (2) destroyed or attempted to destroy, (3) by means of explosive, (4) any vehicle that was used in interstate commerce. 18 U.S.C. § 844(i). Proving a violation of Count 2 requires proof of an element not required to be proved in Count 1: specifically, in Count 2, the vehicle itself must be *used* in interstate commerce, rather than the lesser requirement that the offense *affect* interstate commerce found in Count 1. Similarly, Count 1 requires proof of an element not required to be proved under Count 2, specifically, that the destroyed property be within the United States. Pursuant to Blockburger, because each count requires proof of an element the other does not, the two counts are not multiplicious.

We find, however, that Counts 5 and 6 cannot survive the Blockburger test. Count 5 alleged a violation of 26 U.S.C. § 5861(d), which makes it unlawful to: (1) possess, (2) a machinegun, (3) that is not registered in the National Firearms Registration and Transfer Record. Count 6 alleged a violation of 18 U.S.C. § 922(o), which makes it unlawful to (1) possess (2) a machinegun. Section 922(o) does not apply to machineguns that were possessed lawfully prior to the passage of section 922(o) in 1986. 18 U.S.C. § 922(o)(2)(B).

A violation of section 5861(d) requires proof of an element not required to be proved under section 922(o): that the possessed machinegun was unregistered. However, under Blockburger, both statutes must require proof of an element not required to be proved by the other.[4] Here, section 922(o) does not require proof of

_____

question here because to do so is unnecessary as other elements satisfy the Blockburger requirement.

[4]We note the Blockburger test is not controlling "where there is clear indication of a contrary legislative intent." United States v. Bass, 794 F.2d 1305, 1308 (8th Cir. 1986). However, there is no clear indication that Congress intended that 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(d) be used concurrently to punish the same conduct.

an element not included in section 5861(d). Therefore, section 922(o) is a lesser included offense of section 5861(d). One statute punishes the ownership of any machinegun; the other punishes ownership of an unregistered machinegun.

The Government attempts to save the two counts by arguing that the additional element required to be proved by section 922(o) is possession after the year 1986, when section 922(o) went into effect. Section 922(o)(2)(B) states that the statute's prohibition against possessing machineguns does not apply to guns "lawfully possessed before the date" the subsection of the statute went into effect. 18 U.S.C. § 922(o)(2)(B). If the Government were required to prove that a defendant came into possession of a machinegun after 1986 to win a conviction on a section 922(o) charge, this would be an additional element of the offense, and there would be no double jeopardy concerns with charging violations of both 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(d). However, we have previously stated that "[t]he exceptions contained in [18 U.S.C. § 922(o)(2)] establish affirmative defenses to the defined offense. They are not elements of the offense . . . ." United States v. Just, 74 F.3d 902, 904 (8th Cir. 1996). Thus, the Government's argument has been foreclosed.[5]

The Government alleges that we may not find that these two counts are multiplicious because that would violate our precedent in United States v. Elliott, 128 F.3d 671 (8th Cir. 1997) (per curiam). In Elliott, the defendant was charged with violating both 28 U.S.C. § 922(o) and 26 U.S.C. § 5861(d). Id. at 671-72. Elliott argued on appeal that his conviction under section 5861(d) worked a due process violation because the passage of section 922(o) made it illegal to own a machinegun

Thus, Blockburger controls.

[5]We also note that the district court instructed the jury that possession prior to 1986 was a defense to the charge rather than an element that the Government was required to prove. See Jury Instructions 23, 24.

and impossible to register one. Thus, Elliott argued, section 5861(d) punished him for failing to do what would have been impossible for him to do: register his machinegun. Id. at 672. Several circuits accepted this argument and held that section 922(o) implicitly repealed section 5861(d). We rejected the argument of implicit repeal and found section 5861(d) remained good law because the defendant could comply with it by "simply refusing to possess the machinegun." Id. Elliott, who filed a brief pro se, did not allege a double jeopardy violation, and we did not discuss double jeopardy in our per curiam opinion. Elliott stands only for the proposition that 18 U.S.C. § 922(o) did not repeal 26 U.S.C. § 5861(d). It does not support the proposition that a valid double jeopardy challenge to an indictment that charges a violation of both statutes for the same conduct is without merit. See Wilson v. Zoellner, 114 F.3d 713, 721 n.4 (8th Cir. 1997) (noting we are not bound by issues in prior cases that were "not necessary to decide the issue in the case").

Because we hold that 18 U.S.C. § 922(o) is a lesser included offense of 26 U.S.C. § 5861(d), we remand Mann's convictions for Counts 5 and 6 to the district court with instructions to vacate one of the convictions. See United States v. Muhlenbruch, 634 F.3d 987, 1004 (8th Cir. 2011), cert. denied, 132 S. Ct. 228 (2011).

## C. Notice and Bill of Particulars

Next, Mann argues the district court erred in failing to grant his pretrial[6] motion to dismiss Count 7 of the indictment, which argued the indictment failed to give sufficient notice of the nature of the accusations against him. Additionally, Mann

---

[6]Mann filed his motion during jury selection.

-11-

argues the bill of particulars amended the indictment.[7]  We review a district court's denial of a motion to dismiss an indictment for abuse of discretion.  United States v. Moore, 184 F.3d 790, 794 (8th Cir. 1999).

Count 7 of the indictment stated that from "on or about March 4, 2009, until on or about August 6, 2009 in the Eastern District of Arkansas, the defendants, RANDEEP MANN and SANGEETA MANN, a/k/a SUE MANN, did conspire with each other to corruptly obstruct, influence, and impede an official proceeding, in violation of Title 18, United States Code § 1512 (c)(2)."  Mann argues he was led to believe that this charge related only to the removal of documents from his office.  During jury selection, it became clear that the Government also intended to offer proof of removal of documents from the Manns' home and vehicle and evidence of interference with witness testimony to support the charge.  When this became obvious, Mann made a motion for a bill of particulars and received one.  Mann argues the original indictment was insufficient to give him proper notice of the charges against him as required by the Sixth Amendment.[8]

_____

[7]Mann also appears to argue that he was not given sufficient notice of the charges alleged against him in Count 8; however, he did not move to dismiss Count 8.  "A defendant must raise before trial by motion any objections based on defects in the indictment."  United States v. Sileven, 985 F.2d 962, 965 (8th Cir. 1993) (per curiam) (quoting United States v. Richards, 723 F.2d 646, 648 (8th Cir. 1983) (per curiam)).  Because Mann did not make a motion to dismiss Count 8, we will not address his argument on appeal.

[8]In addition to arguing that the indictment failed to give Mann notice of the totality of actions included in the offense, Mann's reply brief argues the indictment was insufficient because it failed to give Mann notice of which official proceeding Mann was alleged to have obstructed.  "We generally 'do not consider arguments raised for the first time in a reply brief.' . . . We see no reasons to deviate from [this] rule[] in this case."  United States v. Martinson, 419 F.3d 749, 753 (8th Cir. 2005) (quoting United States v. Griggs, 71 F.3d 276, 282 (8th Cir. 1995)).

-12-

"As a general rule, due process requires that the indictment give a defendant notice of each element of the charge against him so that he can prepare an adequate defense."  United States v. Becton, 751 F.2d 250, 256 (8th Cir. 1984).

> An indictment adequately states an offense if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.  An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted."

United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) (quoting United States v. Hernandez, 299 F.3d 984, 992 (8th Cir. 2002)).  Where the plain language of an indictment fails to alert a defendant of the "precise nature of the government's allegations," a bill of particulars can cure deficiencies in the indictment's form.  United States v. Dolan, 120 F.3d 856, 866 (8th Cir. 1997).

Count 7 of the original indictment was not defective.  It contained all the elements of the charged offense and fairly informed Mann of the offense against which he was expected to defend.  Additionally, the charge was sufficient to preclude a subsequent prosecution for Mann's removal of documents from his home and interference with witnesses because it charged him with conspiring to obstruct justice between March 6, 2009, and August 6, 2009.  The removal of documents from Mann's home and interference with witnesses occurred within the time period alleged in the indictment.  Further, Mann was given a bill of particulars during jury selection that provided him with additional notice of the precise allegations against him.  Specifically, the bill of particulars informed Mann that the conspiracy charge included a conspiracy to "hide documents and other objects, including but not limited to firearms, unknown documents from a vehicle, unknown objects from the house,

documents related to Dan Mann, and documents related to Sandip Mann and to influence witnesses." Thus, the indictment provided Mann notice of the elements of the charges against him, and the bill of particulars provided Mann with the precise nature of the charges.

Mann argues the bill of particulars constructively amended the indictment and the district court erred in not dismissing Count 7 or, alternatively, in allowing the Government to introduce evidence disclosed in the bill of particulars rather than limiting it to the evidence originally charged in the indictment. "We review a district court's ruling regarding a bill of particulars for abuse of discretion." United States v. Shepard, 462 F.3d 847, 860 (8th Cir. 2006). "A constructive amendment . . . occurs when the essential elements of the indicted offense are altered, either actually or in effect, after the grand jury has issued the indictment." United States v. Johnston, 353 F.3d 617, 623 (8th Cir. 2002). "A constructive amendment primarily affects the defendant's Fifth Amendment right to indictment by a grand jury . . . ." United States v. Renner, 648 F.3d 680, 685 (8th Cir. 2011) (quoting United States v. Adams, 604 F.3d 596, 599 (8th Cir. 2010)).

The bill of particulars did not constructively amend the indictment against Mann. Count 7 of the indictment listed the essential elements of the charge as conspiracy to corruptly obstruct, influence, and impede an official proceeding, in violation of 18 U.S.C. § 1512 (c)(2). The essential elements of the charge remained the same in the bill of particulars. The indictment limited the time period and location of the conspiracy charge to "from on or about March 4, 2009, until on or about August 6, 2009, in the Eastern District of Arkansas," and the time frame and limitations included in the indictment in Count 7 were not extended by the bill of particulars. The bill provided Mann with the precise nature of the charge against him without altering the essential elements of the indictment.

-14-

We find the district court did not err in refusing to dismiss Count 7 from the indictment or in its decision relating to the bill of particulars.

## *D. Joinder*

Mann contends that the indictment improperly joined offenses and defendants by (1) charging Mann's firearms offenses, bombing offenses, and obstruction offenses in the same indictment and (2) by including charges against his wife in the same indictment which charged Mann. Mann argues this constituted misjoinder under Federal Rule of Criminal Procedure 8. Alternatively, Mann argues the district court should have granted his motion to sever under Rule 14. We review allegations of misjoinder under Rule 8 de novo; however, we review denial of severance for an abuse of discretion. See United States v. Liveoak, 377 F.3d 859, 864 (8th Cir. 2004).

Rule 8(a) governs the joining of offenses and permits the joinder of offenses that are "of the same or similar character or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 8(b) governs the joinder of defendants and states that two or more defendants can be charged together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

## *i. Propriety of Joinder of Offenses*

Mann was charged in the same indictment with (1) offenses relating to the bombing of Dr. Pierce; (2) an offense alleging Mann's possession of unregistered grenades; (3) offenses alleging Mann possessed an unregistered machinegun and shotgun; and (4) offenses alleging Mann corruptly conspired to and did obstruct justice. Where an indictment joins defendants as well as offenses, the propriety of the

joinder of offenses is governed by Rule 8(b), rather than Rule 8(a). See United States v. Jones, 880 F.2d 55, 60-61 (8th Cir. 1989). "This is significant because the language of 8(a) does not allow joinder on the same basis as 8(b); the words 'same or similar character' are omitted from 8(b)." Id. at 61. For offenses to be properly joined in an indictment that also joins defendants, the offenses must be part of "the same series of acts or transactions." See id.; see also Fed. R. Crim. P. 8(b). "Generally, the 'same series of acts or transactions' means acts or transactions that are pursuant to a common plan or a common scheme." United States v. Wadena, 152 F.3d 831, 848 (8th Cir. 1998).

Counts 1 and 2 charged Mann with conspiring to use a weapon of mass destruction and arson of Dr. Pierce's vehicle. These were part of the same act: the bombing of Dr. Pierce. Mann does not contest the joinder of these two offenses. Counts 7 and 8 charged Mann with attempting to obstruct justice by hiding documents and firearms and influencing witnesses in an effort to influence an official proceeding. Mann argues that during the time period when the actions supporting the convictions for obstruction occurred, Mann had only been charged with firearms offenses and had no way of interfering with an official proceeding involving the bombing offenses, which had not yet been charged. The evidence indicated that Mann attempted to influence the testimony of witnesses who were to testify before the grand jury that was tasked with deciding whether to indict Mann on the bombing charges. Obstruction counts are properly joined with substantive counts where the "obstruction charge is connected to, and interrelated with" the substantive charges. See United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005). The attempt to influence grand jury testimony and to hide documents was interrelated with the bombing charges; therefore, the obstruction charges were properly joined.

Next, we consider whether Counts 3, 5, and 6 (the firearms charges) were properly joined with the bombing and obstruction counts. We find that joinder of

-16-

Counts 3, 5, and 6 with the bombing and obstruction counts was improper under Rule 8(b). Count 3 alleged that Mann illegally possessed 98 40mm M406 grenades, and Counts 5 and 6 alleged Mann illegally possessed a machinegun. The bombing of Dr. Pierce occurred in February 2009 and involved an MK3A2 grenade, not an M406 grenade. An MK3A2 is a hand grenade, and an M406 is a 40mm launching grenade. The evidence indicated that Mann obtained the 98 40mm M406 grenades sometime before July 2001 and before Mann's troubles with the Board began. The Government did not introduce any evidence indicating that Mann purchased the M406 grenades as part of a plan to bomb Dr. Pierce, nor was it alleged in the indictment.

We fail to see how the possession of unregistered grenades that were purchased at least seven years prior to the bombing and were not the type used in the bombing could be considered part of a common scheme or plan to bomb Dr. Pierce. Thus, the joinder of Count 3 with the bombing, arson, and obstruction charges was improper. Similarly, Mann's possession of an unregistered machinegun was entirely unrelated to the bombing and arson. The indictment did not allege, and the Government did not prove, any connection between Mann's possession of the machinegun and the commission of the bombing. Accordingly, the joinder of Counts 3, 5, and 6 with the bombing and arson charges was improper.

*ii. Was Mann prejudiced by misjoinder in his defense of the firearms offenses?*

Finding that Counts 3, 5, and 6 were improperly joined does not end our inquiry. "[M]isjoinder requires reversal only if it result[ed] in actual prejudice because it had substantial and injurious effect or influence on determining the jury's verdict." United States v. Sazenski, 833 F.2d 741, 745 (8th Cir. 1987) (internal quotation marks omitted). "Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment

right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n.8 (1986). The Supreme Court has "suggested several factors that might lead to a finding of prejudice: (1) failure to give limiting instructions; (2) evidence of guilt that is not overwhelming; (3) admission of evidence that would be inadmissible in a trial of only properly joined defendants and counts; (4) evidence on the improperly joined charges that is indistinct and not easily segregated; and (5) en masse trial of numerous defendants." Sazenski, 833 F.2d at 745-46.

We first apply these factors in considering whether Mann was prejudiced in his defense of the firearms offenses because they were joined with the arson and bombing offenses. First, the jury was instructed to "consider, separately, each crime charged against each individual defendant." Jury Instruction 5. Second, there was overwhelming evidence of guilt as to Mann's possession of the unregistered grenades. City workers discovered the 98 40mm grenades approximately 900 feet from Mann's home. Lloyd Hahn testified that he had sold Mann around that number of 40mm grenades. Additionally, Hahn testified that he removed the manufacturing date from the grenades he sold to Mann, and two agents testified that portions of the manufacturing date were removed from the buried grenades found near Mann's home. The grenades were buried in a green military container, and agents discovered similar green military containers in Mann's home, including one with the same lot number as the buried container. Agents also found two grenade launchers capable of firing 40mm grenades and manuals on how to use grenades and a grenade launcher in Mann's home. Finally, Jeff Kimbrough, who installed an alarm system in Mann's home, testified he saw something similar to a 40mm grenade in Mann's home.

Similarly, there was overwhelming evidence of guilt as to Mann's illegal possession of a machinegun. Agents seized a 7.62 by .39 caliber machinegun from Mann's home. ATF agent Michael Knapp testified that the gun contained the serial number BM-0834 and the number 1442 was scratched into the gun. Gary Schiable,

a program manager who worked for the ATF, testified that a 7.62 by .39 caliber machinegun with serial number BM-0834 was not registered to Mann, but a 7.62 by .39 caliber machinegun with serial number 1442 was registered to Mann. The registered machinegun had paperwork that indicated the gun was made by Lloyd Hahn. However, Hahn testified that he did not manufacture the seized gun, indicating the seized firearm was not the registered firearm.

The jury was instructed to keep the evidence of the crimes separate, this was not an en masse trial of multiple defendants, and the evidence of guilt was overwhelming as to Mann's possession of the unregistered grenades and the machinegun. Accordingly, we find that under the factors referenced in Sazenski, that Mann was not prejudiced in his defense of the firearms charges by their joinder with the bombing charges.[9]

---

[9]We note that Mann also argues that the denial of severance was prejudicial because he would have testified on his own behalf at separate trials on the firearms counts, but desired to assert his Fifth Amendment rights as to the bombing and arson charges. Severance of counts is required on such a basis "only when a defendant has made a 'convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other.'" United States v. Jardan, 552 F.2d 216, 220 (8th Cir. 1977) (quoting Baker v. United States, 401 F.2d 958, 977 (D.C. Cir. 1968)). "In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." Id. (quoting Baker, 401 F.2d at 977). Mann did not state in his brief what reason he had for refraining from testifying on the arson and bombing counts, nor did his brief indicate what arguments he made to the district court in this matter or if he made them at all. In his original motion to sever to the district court, Mann stated it was "unclear whether Mann [would] testify on any counts; however, it [was] clear that his testimony on the gun counts would pertain solely to his collection of firearms and his

*iii. Was Mann prejudiced by misjoinder in his defense of the bombing offenses?*

Next, we determine whether Mann was prejudiced in his defense of the bombing offenses by their joinder with the firearms offenses by looking to the five factors outlined in Sazenski. First, the jury was instructed to keep the evidence of each of the charges separate. "[J]uries are presumed to follow their instructions." Zafiro v. United States, 506 U.S. 534, 540 (1993) (citation and quotation marks omitted). The jury acquitted Mann of Count 4, which alleged he illegally possessed an unregistered shotgun. A jury's acquittal of a defendant on some of the charges "indicates that the jury did indeed consider the offenses separately and was able to 'distinguish among the evidence presented on each count.'" United States v. Sw. Bus Sales, Inc., 20 F.3d 1449, 1454 (8th Cir. 1994) (quoting United States v. Hutchings, 751 F.2d 230, 236 (8th Cir. 1984)).

Second, the evidence of Mann's possession of the M406 40mm grenades would likely have been admissible in a separate trial on the bombing and arson counts. Evidence of prior bad acts of a defendant may be admitted under Federal Rule of Evidence 404(b) to demonstrate knowledge on the part of the defendant, provided the defense is given proper notice of the Government's intent to introduce the 404(b) evidence. Fed. R. Evid. 404(b). "The district court has broad discretion to admit evidence of other bad acts under Rule 404(b) unless the evidence tends to prove only

---

knowledge of having failed to properly register certain firearms." In the motion to sever, Mann asked the court "to allow him to further consider his anticipated testimony and to proffer such testimony under seal at a hearing prior to the Court's determination of his motion." Mann did not provide us with any excerpts, transcripts, or record with respect to such a hearing. Accordingly, we are in no position to evaluate Mann's proffer as to his need for separate trials based on the Fifth Amendment.

the defendant's criminal disposition." United States v. Emmanuel, 112 F.3d 977, 981 (8th Cir. 1997).

> To be admissible [under 404(b)], evidence must . . . meet the following conditions: (1) it must be relevant to a material issue; (2) the bad act must be reasonably similar in kind and close in time to the crime charged; (3) it must be sufficient to support a jury finding that the defendant committed the prior act; and (4) the probative value of the evidence must outweigh its prejudicial effect.

Id.

Applying these factors, the evidence of Mann's possession of the 98 40mm grenades would have been admissible in a trial on the bombing and arson offenses under 404(b). Mann's possession of 98 40mm grenades, though of a different type than that used in the bombing, is probative evidence that Mann had a working knowledge of grenades. Mann's general knowledge of grenades is relevant to whether he conspired to bomb Dr. Pierce using a grenade. Second, Mann received the 98 40mm grenades from Lloyd Hahn, the same person who provided Mann with MK3A2 grenades, the type of grenade used in the bombing. Additionally, the evidence of Mann's guilt as to the possession of the 40mm grenades is overwhelming, as discussed previously. Finally, when joined with an instruction as to the limited purpose of the evidence of Mann's grenade possession, the introduction of the grenade evidence would have been more probative than prejudicial.[10]

---

[10]We note that we have previously stated that "[w]hen the prosecution relies on a specific type of weapon, it is error to admit evidence that other weapons were found in (the defendant's) possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." Walker v. United States, 490 F.2d 683, 684 (8th Cir. 1974) (citation and alteration marks omitted). We note, however, that Walker did not address admissibility of evidence of other weapons for the limited purpose of showing

Further, in a trial exclusively on the bombing and arson charges, the evidence that Mann had purchased the type of grenade actually used in the bombing would have been admissible. We fail to see how Mann could be prejudiced by admitting evidence of his possession of the 40mm grenades beyond the prejudice he would have suffered from the clearly admissible evidence that Mann had purchased MK3A2 grenades, which were the same type as the grenade used in the bombing.

Additionally, the evidence offered to prove Mann possessed the 40mm grenades was distinct from the evidence offered to support the bombing and arson charges and was easily segregated. The city workers who found the grenades near Mann's home, Mark Rinke and Ryan Kimbell, testified about what they found and the nature of the area, indicating the proximity of the buried grenades to Mann's home. Rinke and Kimbell offered evidence relating only to the 98 40mm grenades and did not offer any testimony to support the arson and bombing charges. Though the evidence of the origin and nature of the 40mm grenades came from witnesses who also testified about the grenade used in the bombing, we find the evidence of the 40mm grenades was sufficiently distinct and separable from the evidence of the bombing such that the jury members were able to keep the evidence of the separate counts distinct in their minds. Finally, with regard to the fifth Sazenski factor, this was not an "en masse trial of numerous defendants." Only Sangeeta Mann was joined as a defendant.

Thus, any misjoinder of Count 3, possession of unregistered grenades, with Counts 1 and 2, the bombing and arson charges, did not prejudice Mann in his defense of the bombing charges. Though the evidence of guilt supporting Counts 1

_____

knowledge under 404(b). We find its language distinguishable from the case at hand.

and 2 may not have been overwhelming, the balance of the <u>Sazenski</u> factors indicates that Mann was not prejudiced by the misjoinder of Count 3 with Counts 1 and 2.

Similarly, we find that Mann was not prejudiced in his defense of the bombing charges by the misjoinder of Counts 5 and 6, the machinegun charges. The jury was properly instructed to keep the evidence distinct and demonstrated that it did so by acquitting Mann of Count 4, which alleged Mann illegally possessed an unregistered shotgun. The trial was not an en masse trial with numerous defendants, and the evidence of Mann's possession of the machinegun was distinct from the evidence of the bombing offenses, as no gun was used in those offenses. For these reasons, we find no prejudice resulted from the misjoinder of these offenses.

*iv. Joinder of Defendants*

We decline to determine whether the joinder of defendants was proper because we find the joinder of Sangeeta Mann as a defendant did not prejudice Mann. Misjoinder of defendants "requires reversal only if it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." <u>United States v. Lueth</u>, 807 F.2d 719, 730 n.6 (8th Cir. 1986) (citation and quotation marks omitted). The Manns were charged with conspiracy to obstruct justice and both were charged separately with actually obstructing justice. Each piece of evidence that the district court admitted relating to Sangeeta Mann was also evidence against Mann that supported the conspiracy charge and would have been admitted even if Sangeeta Mann had not been joined as a defendant.

Accordingly, we find no reversible error relating to the district court's denial of severance.

## III. Trial

### A. Sufficiency of the Evidence as to Count 1

Mann alleges that the evidence was insufficient to support his conviction for Count 1, which charged him with using and conspiring to use a weapon of mass destruction against a person or property within the United States in violation of 18 U.S.C. § 2332a. "We review a challenge to the sufficiency of the evidence de novo, viewing the evidence and all reasonable inferences in the light most favorable to the verdict." United States v. Montes-Medina, 570 F.3d 1052, 1060 (8th Cir. 2009). "We must affirm a jury verdict if, taking all facts in the light most favorable to the verdict, a reasonable juror could have found the defendant guilty of the charged conduct beyond a reasonable doubt." United States v. Balanga, 109 F.3d 1299, 1301 (8th Cir. 1997). "This is a stringent standard and we will uphold the verdict if there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." United States v. McCarthy, 244 F.3d 998, 999-1000 (8th Cir. 2001).

The district court instructed the jury on two alternative legal theories on which Mann could be found guilty: (1) conspiring to use a weapon of mass destruction and (2) aiding and abetting the use of a weapon of mass destruction. The jury found Mann guilty under both theories.[11] Discussing the sufficiency of the evidence for each theory in turn, we affirm the jury's finding of guilt as to Count 1 for the following reasons.

---

[11]The Verdict Form for Count 1 returned by the jury stated: "We, the jury in the above entitled and numbered case, find the defendant RANDEEP MANN, conspired to use and aided and abetted the use of a weapon of mass destruction."

*i. Conspiring to use a weapon of mass destruction*

In order to sustain a conviction on Count 1, conspiring to use a weapon of mass destruction, the Government was required to prove: (1) that Mann used or conspired to use a weapon of mass destruction without lawful authority, (2) that he did so against a person or property within the United States, and (3) that the offense, or the results of the offense, affected interstate commerce. 18 U.S.C. § 2332a(2)(D). Because one of the Government's theories was that Mann conspired with another to commit the act, the Government also had to prove (1) an agreement existed between two or more people to use a weapon of mass destruction, (2) Mann knowingly and intentionally joined the agreement, and (3) Mann was aware of the agreement's purpose. See United States v. Wells, 646 F.3d 1097, 1102 (8th Cir. 2011).

First, we address the sufficiency of the evidence for the jurisdictional element. Under 18 U.S.C. § 2332a(2)(D), federal jurisdiction is allowed where the offense "affect[s] interstate or foreign commerce." When Congress uses the unqualified language "affects interstate commerce" as the jurisdictional hook in a statute, the language "signal[s] Congress' intent to invoke its full authority under the Commerce Clause." Jones v. United States, 529 U.S. 848, 854 (2000). Where a statute contains "an express jurisdictional nexus to interstate commerce," violations that have merely a de minimis effect on interstate commerce satisfy the jurisdictional requirement. United States v. Dobbs, 449 F.3d 904, 912 (8th Cir. 2006).

We have not yet had an opportunity to determine what activities sufficiently affect interstate commerce to be actionable under section 2332a. However, we have ample caselaw touching on what is required to show an activity affects commerce under statutes similar to section 2332a that also contain the "affecting interstate commerce" language as the jurisdictional hook. Our Hobbs Act jurisprudence is helpful, and other circuits have relied on Hobbs Act cases in determining what

-25-

activities sufficiently affect interstate commerce so as to be covered by section 2332a. See, e.g., United States v. Davila, 461 F.3d 298, 306 (2d Cir. 2006) (applying Hobbs Act jurisdiction theories to an 18 U.S.C. § 2332a case).

The Hobbs Act, 18 U.S.C. § 1951, is the federal robbery statute.  If a business is robbed, the Government can meet the Hobbs Act's jurisdictional requirement by proving the robbery depleted the assets of a business operating in interstate commerce.  See United States v. McCraney, 612 F.3d 1057, 1065 (8th Cir. 2010), cert. denied, Williams v. United States, 131 S. Ct. 1784 (2011); United States v. Williams, 308 F.3d 833, 838-39 (8th Cir. 2002).  Under the Hobbs Act, a robbery affects commerce where it results in a business temporarily closing to recover from the robbery.  See United States v. Quigley, 53 F.3d 909, 910 (8th Cir. 1995) (citing United States v. Davis, 30 F.3d 613, 614-15 (5th Cir. 1994)).  Similarly, under section 2332a, a violation of the statute that results in a depletion of assets—including lost business opportunities—of a business operating in interstate commerce satisfies the "affecting commerce" language of the statute warranting federal jurisdiction.

The Government presented evidence at trial that Mann's violation of section 2332a resulted in significant losses to Dr. Pierce's medical clinic, the Family Practice Center of West Memphis.  Pam Falkner, the accountant for Dr. Pierce's clinic, testified that the clinic's profits declined after the bombing by $269,343 in one year. Dr. Pierce testified that he is physically unable to treat the high volume of patients he treated before the bombing and has had to scale back the hours he works in a day. Additionally, Falkner testified the clinic hired an additional physician during 2009 to see Dr. Pierce's patients because he was unable to treat them all himself, as he had done before the bombing.  The clinic was closed completely on the day of the bombing and the following two days, though it was able to reopen the following week as 33 doctors volunteered to cover the clinic during the time Dr. Pierce was in the hospital.

-26-

Additionally, the Government presented sufficient evidence to support the jury's finding that Dr. Pierce's Family Practice Center of West Memphis operated in interstate commerce. Dr. Pierce's wife, Melissa Pierce, who functions as the office's manager and head nurse, testified as to the clinic's interstate activities. Through her testimony, the Government introduced into evidence invoices showing the clinic ordered its medical supplies from outside of Arkansas. The Government also presented evidence that out-of-state service companies routinely serviced part of the clinic's medical equipment. Similarly, a Tennessee company disposed of the clinic's biowaste, and an out-of-state company performed the clinic's quality-control testing. Additionally, the clinic routinely treated patients from a variety of states. Thus, there was ample evidence to support the jury's finding that the bombing of Dr. Pierce affected interstate commerce because it resulted in a depletion of assets of his clinic, which did business in interstate commerce.

Mann contends that we have not extended our depletion-of-assets theory to cases involving individual victims, and the bombing was an attack on Dr. Pierce, individually, at his personal residence, rather than an attack on his clinic. We have, however, extended the depletion-of-assets theory to cases where an individual functions as a business. For example, in Williams, we found the robbery of an owner-driver of a taxicab affected commerce because it resulted in "[t]he lost opportunities to carry customers and packages that might be traveling or carried interstate." Williams, 308 F.3d at 838-39. Similarly, we have found that a robbery of drugs from an individual drug trafficker affects commerce because it "disrupt[s] the movement of a commodity in interstate commerce." McCraney, 612 F.3d at 1065.

Dr. Pierce's medical clinic was a sole proprietorship, Trent B. Pierce, M.D., doing business as Family Practice Center of West Memphis. Prior to the bombing, Dr. Pierce was the only physician who routinely worked in the clinic. As the only physician in his clinic, Dr. Pierce functioned both as a business and as an individual.

However, even if we were to accept Mann's theory that the attack on Dr. Pierce was an attack on the individual and not on the business, we have stated that where an attack is made on an individual, federal jurisdiction still exists where "the acts cause or are likely to cause the individual victim to deplete the assets of an entity engaged in interstate commerce." Quigley, 53 F.3d at 910-11. Because Dr. Pierce ran a sole proprietorship, it was likely that a violent attack on him would result in lost business opportunities for his clinic. For these reasons, Mann's challenge to the jurisdictional requirement fails.

Second, Mann argues there was insufficient evidence presented that he conspired with another to use a weapon of mass destruction. "A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden." United States v. Mickelson, 378 F.3d 810, 821 (8th Cir. 2004). "The fact that the identity of some or all other members of the conspiracy remains unknown will not preclude a conspiracy conviction." United States v. Agofsky, 20 F.3d 866, 870 (8th Cir. 1994). If the government proves beyond a reasonable doubt that a defendant was a member of a conspiracy, the defendant may be convicted for playing even a "minor role." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). By design, a conspiracy to commit a crime is "highly secretive," and, therefore, its existence may be proven through circumstantial evidence alone. Agofsky, 20 F.3d at 870; see also Mickelson, 378 F.3d at 821 (finding details of conspiracies are often "shrouded in secrecy"). Finally, proof of an "explicit, formal agreement" is not required to prove the existence of a conspiracy; instead, a conviction can rest on a tacit understanding. United States v. Hudspeth, 525 F.3d 667, 678 (8th Cir. 2008).

The Government's theory at trial was not that Mann himself actually carried out the bombing, but that he conspired with at least one other to carry it out. We conclude that during the five-week trial the Government presented ample

circumstantial evidence to support the jury's finding that Mann was a member of the conspiracy.

Mann has an alibi for the time period of the execution of the bombing, however the Government presented substantial evidence of Mann's motive to harm Dr. Pierce. Mann had a long history of investigations by the Board, and Dr. Pierce testified that he had been particularly vocal about his belief that Mann was providing improper care to his patients. Dr. Pierce stated that he had expressed frustration that Mann seemed unable to recognize his failures and admonished him publicly in front of the Board. Gerard Riley, a friend of Mann's, testified that Mann once told Riley that he wished he could kill the members of the Board because of the way they had made him suffer by taking away his Drug Enforcement Agency (DEA) license. Additionally, Riley testified that after the bombing, Mann suggested that perhaps the bombing had achieved its intent by causing Dr. Pierce to suffer. The Government also presented evidence of events which occurred shortly before the bombing and which provided additional motive for Mann to harm Dr. Pierce. Specifically, Rita Barthelme, a patient and friend of Mann's, testified that she informed Mann in January 2009 that her sister had made a complaint to the Board alleging that Mann was still prescribing prescription drugs even though he had surrendered his DEA license. The bombing occurred the following month.

Additionally, Mann had access to the type of unique weapon used in the bombing. The Government presented evidence that Mann had owned grenades of the same type and model as the one used in the bombing. Steven Shelley, an explosives enforcement officer with the Bureau of Alcohol, Tobacco and Firearms, testified that the grenade used in the explosion was most likely an MK3A2 concussion grenade. The MK3A2 is a rare grenade normally used by special forces soldiers, such as Army Rangers or Navy SEALs. Lloyd Hahn testified that he had sold Mann approximately eight MK3A2 grenades in the late 1990s. Jeff Kimbrough, who installed Mann's

-29-

alarm system in 2004, testified he saw similar grenades in Mann's home after being shown a disarmed MK3A2 by the Government.[12]

The Government also presented evidence that Mann had access to the type of tire and rim used in the bombing. Phil Barthelme testified that he drove with Mann to the home of Pete Patel, Mann's business partner, and that Mann stated he was picking up a tire from Patel. Patel owned a 2002 Nissan Altima, and after the bombing, investigators found that the original "donut" spare tire[13] from Patel's Altima was missing. Instead, a full-size tire was in the trunk of Patel's Altima. Government officers searched Patel's home, garage, and warehouse but could not find the missing tire. Mark Tanaka, an engineer in the products safety department of Nissan, testified that the spare tire used in the bombing was a Nissan Altima "donut" tire that was produced in April 2002 and that tires are typically installed about two months after they are manufactured. Based on its vehicle identification number, the Altima owned by Pete Patel was manufactured two months later in June 2002.

The Government introduced the testimony of Stephen Briscoe, an inmate who met Mann in the Pulaski County Detention Facility. Briscoe and Mann were introduced in August 2009 by another inmate during a card game. According to Briscoe, a few days after their initial introduction, Mann offered to pay Briscoe $50,000 to kill Dr. Pierce, stating that "Dan and them didn't do a good job the first time." Briscoe testified that Mann told him that Dr. Pierce "was messing up his life and suspended his right to prescription meds . . . and was hating on him because he was Hindu and he wanted Dr. Trent Pierce dead." Additionally, Briscoe testified that Mann "knew that he was going to be charged with a car bombing of Dr. Trent Pierce

---

[12]He also saw something similar to the 40mm grenades found near Mann's home.

[13]A "donut" tire is a smaller tire intended for temporary use.

and that he didn't want Dr. Trent Pierce to be able to come to court because the jury was going to automatically feel sorry for [Dr. Pierce] . . . ." Briscoe testified further that Mann requested the killing appear to be a "drive-by," and told Briscoe that if he agreed to kill Dr. Pierce, Dan would deliver a gun and $50,000 to him. The Government introduced evidence that Mann's son went by the name of Dan. The government also introduced evidence that Mann had access to $50,000 in the form of a $50,000 cash deposit made by Mann's wife on August 21, 2009, and $48,000 in cash found by investigators in the trunk of Mann's Shelby Cobra on March 5, 2009.

Additionally, Dr. Pierce's housekeeper, Velma Gales, testified that on the night before the bombing she saw a suspicious man jogging in place near Dr. Pierce's house, and that the man looked like "one of those people that wear those little dots . . . on his forehead" and may have been "Iranian or something." Evidence established that members of Mann's family were from India. Additionally, there was evidence that Mann sent a picture of Dr. Pierce to his brother in India prior to the bombing, stating that Dr. Pierce was in the picture and stating Mann's hope the picture was a good one. After Mann was arrested, his wife burned documents in the yard; one of the items recovered by ATF agents was a bank binder with the name of Mann's brother on it. Additionally, Mann instructed his wife to remove documents from his clinic before officers executed a search warrant. Some of the documents related to his son, Dan.

Mann's argument on appeal is principally an attack on the credibility of witness testimony. For example, Mann points out that although Phil Barthelme testified Mann and Patel spoke in another language which he could not understand when they discussed the tire, Mann presented evidence that English was the only language shared by Mann and Patel. Further, Mann points out that Velma Gales did not tell the police about the suspicious man until months after the bombing. However, witness credibility is for the jury to determine. "It is the function of the jury, not an appellate

court, to resolve conflicts in testimony or judge the credibility of witnesses." United States v. Harrison, 671 F.2d 1159, 1162 (8th Cir. 1982) (per curiam). "Such credibility findings are 'virtually unreviewable on appeal.'" United States v. Hernandez, 569 F.3d 893, 897 (8th Cir. 2009) (quoting United States v. Boyce, 564 F.3d 911, 916 (8th Cir. 2009)). Many of the witnesses were cross examined at length, and all of Mann's arguments as to plausibility and credibility were ably made to the jury. We recognize that where "[d]ocuments or objective evidence . . . contradict the witness' story; or the story itself . . . [is] internally inconsistent or implausible on its face" the jury is not entitled to credit the testimony. Moore v. Novak, 146 F.3d 531, 535 (8th Cir. 1998). However, Mann has not demonstrated that any of the testimony was sufficiently inconsistent or implausible so as to take the credibility determination away from the jury, and, therefore, the jury was entitled to credit the testimony of the Government's witnesses over Mann's defense.

In addition to attacking the credibility of Government witnesses, Mann offered innocent explanations for some of the evidence presented at trial. Mann argues that thousands of MK3A2 grenades have been produced and that it is unreasonable to believe that Mann would have stored the grenades he bought from Hahn for over a decade. Mann also explained why he sent a picture of Dr. Pierce to his brother by offering evidence that in the Hindu religion, it is common to send pictures to relatives so that they can better pray for people in positions of authority over their family members.

The jury was not required to accept Mann's theory of the case or his explanation of the evidence presented against him. See Pletka v. Nix, 924 F.2d 771, 773 (8th Cir. 1991) (noting "jury was entitled, though not required, to accept" defendant's theory of the case). "For evidence to be substantial, it need not exclude every reasonable hypothesis of innocence, but simply be sufficient to convince the

jury beyond a reasonable doubt that the defendant is guilty." United States v. Drees, 146 F.3d 604, 605 (8th Cir. 1998) (citation and internal quotation marks omitted).

Mann also attacks the testimony of Stephen Briscoe and contends Briscoe's testimony is legally insufficient to support a conviction. According to Mann, Briscoe is not credible and his testimony has little probative value because the Government did not call other inmates as witnesses to corroborate that Mann solicited Briscoe to kill Dr. Pierce.

Although Briscoe is a jailhouse snitch, the jury was entitled to weigh, consider, and ultimately believe some or all of his testimony. Further, it is well-settled in this Circuit that a conviction will not be

> rendered legally infirm simply because much of the testimony linking [a defendant] to the conspiracy came from "jailhouse snitches" and codefendants. Such considerations bear on those witnesses' credibility, and it is not our province on appeal to reweigh the evidence or judge the credibility of witnesses when reviewing the sufficiency of the evidence.

United States v. Wells, 646 F.3d 1097, 1104 (8th Cir. 2011) (internal quotation marks and alteration omitted).

The jury heard evidence and argument challenging Briscoe's credibility, but nothing about Briscoe's testimony justifies rejecting it as a matter of law. See United States v. Crenshaw, 359 F.3d 977, 988 (8th Cir. 2004) ("The test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible."). Significantly, Briscoe was subjected to a rigorous cross-examination and the jury was presented with evidence that Briscoe: cooperated and testified against other defendants on three

separate occasions in exchange for a reduction in his sentences; had a significant criminal history; sought and was denied a one-year reduction in his sentence from the prosecutor in this case; had only known Mann for two days when Mann solicited Dr. Pierce's murder; and did not testify consistently before the grand jury. However, "[t]estimony does not become legally unsubstantial because the witness stands to gain by lying; the defendant is entitled to cross-examine such witnesses to expose their motivations, and it is up to the jury to decide whether the witness is telling the truth despite incentives to lie." Id. Therefore, it is not within our province on appeal to reweigh Briscoe's testimony when reviewing the sufficiency of the evidence because that was a determination for the jury.

Further, we conclude that Mann's conspiracy conviction stands without consideration of Briscoe's testimony. In keeping with the highly secretive design of such a crime, the Government's case and Mann's agreement were proven through the use of circumstantial evidence. See Agofsky, 20 F.3d at 870. Viewing all of the evidence in the light most favorable to the Government, someone attacked Dr. Pierce on February 4, 2009 by using a bomb made from an MK3A2 grenade and a 2002 Altima spare tire. Mann had an alibi as to the time frame of the bombing, but he also had a motive to harm Dr. Pierce: not only had he made statements that he wanted the Board dead, he suggested the bombing achieved its intent by making Dr. Pierce suffer. Further, Mann knew that he was likely the subject of additional disciplinary action.

Mann also had access to rare MK3A2 grenades and a 2002 Altima spare tire to construct the explosive device. The tire used in the bombing was manufactured two months before Patel's Altima, fitting the standard time frame suggested by an Altima employee. Mann had sent a picture of Dr. Pierce to his brother in India. After his arrest, Mann's wife burned documents later discovered to relate to the bank records of his brother. Also, Velma Gales testified that the night before the bombing

she saw a suspicious man jogging in place in front of Dr. Pierce's home that the jury could have inferred was Mann's son.

Considering this evidence as a whole and in the light most favorable to the Government, Mann had the motive and weapon to accomplish the bombing and engaged the help of, and agreed with, at least one other person to carry out the bombing. The Government was not required to prove the identity of the other members of the conspiracy, and was able to prove Mann's involvement entirely through circumstantial evidence. Thus, we find that, with or without the testimony of Stephen Briscoe, it was not unreasonable for the jury to find that Mann knowingly and intentionally entered into an agreement with another individual to use a weapon of mass destruction against Dr. Pierce.

For these reasons, we affirm the jury's conviction on Count 1 of conspiracy to use a weapon of mass destruction.

*ii. Aiding and abetting the use of a weapon of mass destruction*

The jury also convicted Mann of aiding and abetting the commission of use of a weapon of mass destruction. See 18 U.S.C. § 2332a; 18 U.S.C. § 2. To convict Mann of aiding and abetting, the Government had to prove Mann: "(1) associated himself with the unlawful venture; (2) participated in it as something he wished to bring about; and (3) sought by his actions to make it succeed." United States v. Santana, 524 F.3d 851, 854 (8th Cir. 2008). Association alone is insufficient; however, "jurors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences." Id. (citation omitted). And a conviction for aiding and abetting does not require proof of an agreement, but rather "affirmative

-35-

participation which at least encourages the perpetrator." United States v. Thomas, 971 F.2d 147, 149-50 (8th Cir. 1992).

Mann argues his conviction for aiding and abetting was not supported by the evidence. He contends that the evidence presented by the Government—specifically, the grenade, tire, and motive—cannot support reasonable inferences of guilt, and merely generate speculation or conjecture. We draw reasonable inferences in favor of the jury's verdict, but the Government is not entitled to inferences based on conjecture and speculation. United States v. Boesen, 491 F.3d 852, 858 (8th Cir. 2007). We do not consider the evidence against Mann piecemeal. Instead, we look at the evidence "as a whole," United States v. Cook, 603 F.3d 434, 437 (8th Cir. 2010), including circumstantial evidence, United States v. Ellefson, 419 F.3d 859, 862-63 (8th Cir. 2005).

Contrary to Mann's contention, the Government did not simply introduce evidence that Mann had a grenade and a tire. Rather, as previously described, there was ample evidence presented to support the inferences drawn by the jury that Mann possessed a weapon of mass destruction and supplied it to another knowing it would be used to harm Dr. Pierce. Considering the totality of this evidence, we cannot reverse the jury's verdict because a reasonable jury could conclude beyond a reasonable doubt that Mann aided and abetted the use of a weapon of mass destruction. Therefore, we affirm the jury's conviction on Count 1.

### B. Sufficiency of the Evidence as to Count 2

In Count 2, Mann was charged with aiding and abetting the malicious damage or destruction of a vehicle by means of an explosive in violation of the federal arson statute. See 18 U.S.C. § 844(i). The Government was required to prove Mann aided

and abetted in: (1) maliciously damaging or destroying,[14] (2) by means of fire or an explosive, (3) a vehicle used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.  See id.

The evidence presented with respect to this charge was the same as the evidence presented on Count 1:  Mann used a weapon of mass destruction against a person or property within the United States.  For the reasons previously discussed, the evidence as to the perpetration of the bombing and arson was sufficient to support the jury's verdict on the first two elements of section 844(i).

Mann contends the Government presented insufficient evidence to support the jurisdictional element of 18 U.S.C. § 844(i).  To satisfy a conviction under Count 1, any de minimis affect on commerce was sufficient; however, to sustain a conviction under Count 2, the Government had to prove that the damaged vehicle itself was "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  18 U.S.C. § 844(i).

When analyzing whether property was "used in" interstate commerce for purposes of section 844(i), the Supreme Court has reasoned the proper inquiry examines the function of the property itself, and then determines "whether that function affects interstate commerce."  See Jones, 529 U.S. at 854 (internal quotation marks omitted).  Section 844(i)'s jurisdictional requirement "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce."  Id. at 855.  The statute does not extend to damaged or destroyed property that "might affect interstate commerce"; instead, Congress requires that the property itself was used in interstate commerce or an activity

---

[14]The Government introduced the bumper of Dr. Pierce's vehicle at trial, sufficiently establishing that the vehicle was damaged.

affecting interstate commerce.  Id. at 854 (internal quotation marks omittted). Therefore, in Jones, the Court held that because the owner's home was used as "the center of his family life" rather than in a "trade or business," the jurisdictional requirement was not met.  Id. at 856.

Following the analytical framework set forth by the Court in Jones, we must first consider the function of the vehicle.  Then, we will consider if sufficient evidence supports the determination that the vehicle's function affects interstate commerce.

The Government presented evidence, uncontested by Mann, demonstrating the various functions of Dr. Pierce's automobile.  Dr. Pierce testified that he drives his vehicle bi-monthly to Little Rock, Arkansas from West Memphis, Arkansas for Board meetings.  Peggy Cryer, the executive secretary of the Board, testified that Board members are reimbursed for their mileage and hotel expenses for travel to Board meetings and are paid $115 for each day that they attend the meetings.  At trial, the Government introduced Dr. Pierce's travel reimbursements dating back to December 2006.  As further evidence that Dr. Pierce used his automobile to conduct Board business, the Government introduced evidence that Pierce uses his vehicle for the purpose of transporting Board files.  The Board regularly ships files to its members so that they may prepare for meetings.  Board members are expected to transport these files with them to the Board meetings in Little Rock.  On the day of the bombing, Dr. Pierce was preparing to go to Little Rock to attend a Board meeting, and his car contained the Board files when it was damaged in the bombing.

Having considered the function of Dr. Pierce's vehicle, we must now consider if the function affects interstate commerce.  We find our prior decision in United States v. Michaels, 726 F.2d 1307 (8th Cir. 1984) controlling, because the victim actively used his automobile for business purposes, and the court applied the same

-38-

two-step analysis adopted by the Jones Court. See Michaels, 726 F.2d at 1310 (finding that the personal automobile was used to conduct business and then holding the business accomplished with the car affected interstate commerce).

In Michaels, the defendant was charged with destroying the automobile of a union organizer. Id. The "uncontradicted evidence sufficiently demonstrate[d] that the Cadillac automobile was used by [the victim] to conduct union business." Id. As a union organizer, the victim "traveled to various job sites for the purpose of enrolling new members in the union and collecting money owed the union by current members." Id. The union paid him $200 per month as a "reimbursement for using his personal automobile to conduct union business." Id. The court concluded the "use of the automobile was an integral and necessary part of [the victim's] job assignment and was not merely a means of traveling to and from work." Id. To prove the victim in Michaels used his personal automobile to conduct union business, the Government introduced evidence obtained at the scene of the bombing. Id. This included a briefcase containing membership forms, booklets, receipts, and agreements relating to union business. Id.

The Tenth Circuit has also considered whether vehicles were "used in" commerce for the purpose of the federal arson statute. Compare United States v. Grassie, 237 F.3d 1199, 1212 (10th Cir. 2001) (holding use of personal truck to transport pecans satisfied the "used in" commerce requirement ), with United States v. Monholland, 607 F.2d 1311, 1316 (10th Cir. 1979) (holding judge's truck, which was only used to transport judge "back and forth" from work, was not "used in" commerce). In Monholland, the court held the judge's use of his truck had an affect on interstate commerce that was "something less than what is de minimis."[15] 607 F.2d

_____

[15]In Michaels, this Court was similarly faced with determining whether the Tenth Circuit's reasoning in Monholland precluded holding jurisdiction satisfied. Michaels, 726 F.2d at 1310 (citing Monholland, 607 F.3d at 1314-16). In

at 1316. There, the only evidence of interstate commerce was "the fact that a judge has handled various kinds of cases which involve parties who have come to Oklahoma in order to litigate." Id. The court reasoned that for there to be a connection "between the vehicle and the work, it must be shown that there exists a nexus between the two activities." Id.

In Grassie, the Tenth Circuit held, as we do in this case, that "Jones does not pronounce law on any point which requires us to reverse these convictions," and continued to follow its prior precedent from Monholland. See 237 F.2d at 1207. The court distinguished Monholland, however. See id. at 1212. It held that although the victim's use of a truck "approaches that level" of being so remote as to constitute "something less than de minimis," it was still used in interstate commerce. Id. (citing Monholland, 607 F.2d at 1316). In Grassie, a student had used his personal vehicle, a Ford Bronco, to transport pecans to a broker, id. at 1205, but the use was only seasonal, the pecans were only transported approximately two miles, the victim was not reimbursed or paid for this service, and the vehicle was not being used for this purpose when it was damaged, id. at 1212.

The Government contends Dr. Pierce used his vehicle in an activity affecting commerce because he used the vehicle to transport himself and Board files to Board meetings and the Board is engaged in interstate commerce. Ms. Cryer testified that the Board credentialed physicians and health providers and sold information relating to those credentials to hospitals and insurance companies located outside of Arkansas. Additionally, the Board is paid licensing fees from physicians who are licensed in

_____

Monholland, the court reasoned that because the judge would find another means to travel to work if the vehicle failed, the vehicle was "immaterial as far as any commerce" was concerned. 607 F.3d at 1316. If that logic prevailed, then we would have also found jurisdiction lacking in Michaels. If the union organizer's vehicle failed, he would have used a different vehicle to conduct union business.

Arkansas but live elsewhere. Finally, the Board sends information regarding its disciplinary actions to the Federation of State Medical Boards, located in Texas, and provides that information to the National Practitioner Data Bank. Based on these facts, the Government presented sufficient evidence to support the jury's finding that the Board's activities affect interstate commerce.

Like the union organizer in Michaels, Dr. Pierce received an "allowance as reimbursement for using his personal automobile to conduct [Board] business." See Michaels, 726 F.2d at 1310. Just as the union organizer in Michaels "traveled to various job sites for the purpose of enrolling new members in the union and collecting money owed the union by current members," id., Dr. Pierce, as the Chairman of the Board, traveled to Little Rock for the purpose of evaluating doctors licensed by the Board and fining physicians pursuant to the Medical Practice Act. Dr. Pierce was reimbursed for the use of his vehicle, not only for travel to Board meetings, but also for other trips he made in his capacity as Chairman.

Additionally, Dr. Pierce's vehicle was an integral part of his Board membership. The vehicle's function was not only to transport Pierce to Board meetings and other trips made on behalf of the Board, but it was also used to transport Board files to the meetings, instead of shipping them. The entire premise of the Government's prosecution was that Dr. Pierce was targeted precisely because of his Board activities, which required the use of his personal vehicle. Significantly, just as this Court in Michaels reasoned that files found in the victim's personal car provided evidence the victim used the car to conduct union business, id., the Board files were in Dr. Pierce's vehicle when it was damaged in the bombing. Further, Dr. Pierce was preparing to get in the vehicle to drive to a Board meeting when the bomb exploded. This indicates the vehicle was "actively employed" in its role in interstate commerce and demonstrates an even stronger connection to being "used in" commerce than the vehicle in Grassie, a case relying on Monholland. See Grassie, 237 F.3d at 1212 (holding jurisdictional

-41-

requirement met even though victim was not using vehicle in commercial activity at time of arson).

Based on the facts of this case, we hold the similarities in <u>Michaels</u> controlling, and reviewing this challenge to sufficiency of the evidence "in the light most favorable to the verdict" and accepting every reasonable inference in support of the verdict, see Montes-Medina, 570 F.3d at 1060, we find that Dr. Pierce's vehicle was "used in" commerce, within the <u>Jones</u> Court's interpretation of section 844(i). Here, there was a nexus between the vehicle and the Board's work that made the use more than a means of traveling to and from work, but rather property used in a "trade or business." <u>See</u> <u>Jones</u>, 529 U.S. at 856. Therefore, the evidence was sufficient to support the jurisdictional requirements pronounced by <u>Jones</u>. Accordingly, we affirm Mann's conviction as to Count 2.

## C. Sufficiency of the Evidence as to Count 3

Next, Mann contends that the evidence was insufficient to support the jury's finding that he violated 26 U.S.C. § 5861(d) by unlawfully possessing 98 40mm M406 unregistered grenades. Section 5861(d) makes it unlawful "to receive or possess a firearm which is not registered . . . in the National Firearms Registration and Transfer Record." The term "firearm" as used in section 5861(d) applies only to certain weapons, as detailed in 26 U.S.C. § 5845(a); grenades are included in the definition of firearms under section 5845(f). <u>See</u> 26 U.S.C. § 5845. Though the registration statute does not contain a mens rea requirement, we read in a requirement that the defendant must knowingly possess the firearm and that he must know that his weapon is capable of functioning as one of the firearms listed in 26 U.S.C. § 5845. <u>See</u> <u>United States v. Smith</u>, 508 F.3d 861, 866 n.3 (8th Cir. 2007); <u>United States v. Barr</u>, 32 F.3d 1320, 1323 (8th Cir. 1994). Therefore, in order to support a conviction for Count 3,

the Government was required to prove that Mann knowingly possessed unregistered grenades that were capable of functioning as grenades. See 26 U.S.C. § 5861(d).

Mann contends the Government's evidence was insufficient to prove he possessed the grenades. The grenades were not found in Mann's actual possession or on his property. However, the Government can prove possession by showing Mann had actual or constructive possession of the grenades. See Smith, 508 F.3d at 866. Constructive possession exists where the defendant has "'ownership, dominion or control'" over the firearm. Id. "Mere physical proximity to a firearm is not enough to show constructive possession, 'but knowledge of [a firearm's] presence, combined with control is constructive possession.'" Id. (citation omitted). We recognize that "'a jury rarely has direct evidence of a defendant's knowledge'" of a firearm's presence, and therefore knowledge is "'generally established through circumstantial evidence.'" Id. at 867 (citation omitted).

City workers discovered the 98 40mm grenades buried approximately 900 feet from Mann's home. Evidence at trial indicated the grenades were found in a largely undeveloped subdivision where four homes were located, including Mann's. The grenades were found on March 3, 2009, within a month of the bombing of Dr. Pierce, and two witnesses testified that the grenades appeared to have been freshly buried. The grenades were buried in a green military container, and agents discovered similar green military containers in Mann's home, including one with the same lot number as the buried canister. Agents also found practice grenades, two grenade launchers capable of firing 40mm grenades, and manuals on how to use grenades and grenade launchers in Mann's home.

Additionally, Lloyd Hahn testified that after selling Mann several practice grenades, he requested that Hahn keep him in mind if Hahn came into possession of any live grenades. Hahn testified that he sold Mann roughly 100 active 40mm

grenades. Hahn also testified that he removed the manufacturing date from the grenades he sold Mann and wiped the grenades clean of fingerprints. Two agents testified that portions of the manufacturing date were removed from the buried grenades, and no fingerprints were found on them.

From this evidence, the jury could have reasonably concluded that Mann owned and had sufficient control over the grenades to establish that he was in constructive possession of them. For these reasons, we affirm Mann's conviction as to Count 3.

### D. Sufficiency of the Evidence as to Counts 5 and 6

Next Mann contends that there was insufficient evidence to support his convictions for possession of a machinegun and for possession of an unregistered machinegun. As we have previously stated, one of those convictions will be set aside by the district court on remand based on a double jeopardy violation. Accordingly, we decline to evaluate the sufficiency of the evidence without knowing which conviction will stand.

### E. Sufficiency of the Evidence as to Counts 7 and 8

Mann argues the evidence was insufficient to support his convictions on Counts 7 and 8, which alleged obstruction of justice. Specifically, he alleges the prosecution failed to prove that Mann acted dishonestly or in contemplation of a particular official proceeding in which the obstructed information might have been material. Mann also argues that the jury instructions on Counts 7 and 8 allowed the jury to convict Mann for innocent conduct.

Count 7 charged Mann with violating 18 U.S.C. § 1512(c)(2) and (k), which make it a crime to conspire to "corruptly" "obstruct[], influence[], or impede[] any

official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2). Count 8 charged Mann with violating 18 U.S.C. § 1512(c)(1) and (2), which make it a crime to corruptly alter, destroy, mutilate, or conceal a record, document, or other object, or attempt to do so, with the intent to "impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1)-(2). We have found that a defendant can be convicted of knowingly engaging in corrupt persuasion where the defendant "acted with 'consciousness of wrongdoing.'" United States v. Craft, 478 F.3d 899, 900 (8th Cir. 2007) (citation omitted).

The evidence at trial indicated that on March 6, 2009, while Mann was incarcerated pending his detention hearing, Sangeeta Mann told Mann that Mann's lawyer had informed her that agents likely would be searching Mann's office soon. Mann instructed her to remove "the Sunny stuff" from a drawer in his office and to give it to Gerard Riley or to an individual named Tim. Evidence indicated that "the Sunny stuff" referred to papers of Mann's brother, Sandip, who was a person of interest in the bombing. The Manns appeared aware of the pending detention proceeding because Sangeeta mentioned to Mann that he would be home in a few more days. In another conversation, Mann and Sangeeta discussed her upcoming testimony before the grand jury. Mann instructed Sangeeta to go to his office and tidy up and "take out Dan's papers, ownerships, and all that stuff. Give it to Dan."

Evidence indicated that Dan, Mann's son, was also a person of interest in the bombing. After the search warrant was executed on the office, Mann asked Sangeeta what the agents seized from the office, and she told him "we did good." Additionally, Mann asked Sangeeta to call Phil Barthelme, and Mrs. Mann responded: "She said she would keep taking care of it every night," apparently referring to Phil's wife, Rita Barthelme, who testified she took several carloads of things from the Manns' home and burned them. In another conversation, Mann asked Sangeeta whether she "clean[ed] the van" because he "had some medical record stuff in plastic" that needed

to be eliminated. Mann appeared to get frustrated when he learned that Sangeeta had not yet cleaned the van. Gerard Riley testified that Sangeeta Mann brought him a file of papers to keep after Mann was arrested and that she retrieved the papers the next day. Riley told Sangeeta that ATF agents knew she had given him the file, and Mrs. Mann stated, "they don't know everything."

Mann argues on appeal that the evidence failed to prove he knew the items moved would be relevant to an official proceeding because "[t]he proof did not show any particular proceeding the Manns consciously intended to impede by moving the documents or objects from the office." Mann contends that the detention hearing was the only official proceeding of which he and Sangeeta were aware, and there is no evidence that they knew the documents would be relevant to the detention hearing. Mann argues that because the two did not remove documents for the purpose of concealing them from an official proceeding, their conduct was not unlawful. Mann also notes that there were innocent reasons for the removal of the documents, including security.

Though Mann offers innocent explanations of his and Sangeeta's actions, "[w]e will uphold the jury verdict if a reasonable minded jury could have found the defendant guilty beyond a reasonable doubt." United States v. Smith, 91 F.3d 1199, 1200 (8th Cir. 1996). The Manns' conversations indicated that they were clearly aware of the pending detention hearing and search of Mann's office when they agreed to have Sangeeta remove certain documents and give them to friends. We find "the jury could have reasonably inferred from this sequence of events that, by [ordering Sangeeta to] remov[e] documents related to Sandip from the office shortly before the search and by [ordering her to give them to] a trusted friend of the family to hold," that Mann corruptly conspired to and intended "to impair the availability of these documents to the ongoing grand jury investigation." United States v. Mann, 685 F.3d 714, 724 (8th Cir. 2012). Based on the evidence, we find that a reasonable juror could

have concluded that Mann's conduct was not innocent but instead that Mann conspired to and did obstruct an official proceeding with consciousness of wrongdoing.

In addition to challenging the sufficiency of the evidence, Mann argues the Jury Instructions on Counts 7 and 8 allowed Mann to be convicted of innocent conduct. However, the instructions on both counts told the jury that it must find that Mann acted corruptly, and the jury was instructed that "corruptly" means to act with "consciousness of wrongdoing." To support his argument, Mann cites Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), in which the Supreme Court recognized that "'persaud[ing]' a person 'with intent to . . . cause' that person to 'withhold' testimony or documents from a Government proceeding or Government official is not inherently malign." Id. at 703-704. However, after Arthur Andersen, we have found that when a defendant acts with "'consciousness of wrongdoing'" in concealing material, his conduct is not innocent. See Craft, 478 F.3d at 900 (citation omitted). Accordingly, the jury was properly instructed, and Mann's argument is without merit.

For these reasons, we find the evidence was sufficient to support convictions for Counts 7 and 8.

*F. Variance and Constructive Amendment as to Evidence for Count 5*

Next, Mann argues the Government's theory at trial as to Count 5 constructively amended the indictment and that the evidence at trial constituted a material variance from the evidence presented to the grand jury. Mann was convicted on Count 5 of possessing an unregistered 7.62 by .39 caliber machinegun. Documents on file with the ATF indicated that Mann had registered a 7.62 by .39 caliber machinegun bearing serial number 1442, which he had obtained from Lloyd Hahn. The seized 7.62 by .39

caliber machinegun, which Mann was convicted of possessing, contained the serial number BM-034, and the number 1442 had been scratched into the gun. Mann planned to defend the charge that he possessed an unregistered machinegun by demonstrating that the BM-034 firearm was the same firearm that he had registered, based on Lloyd Hahn's pre-trial indications that he had manufactured the BM-034 machinegun. However, at trial Hahn testified that he had not manufactured the firearm.

Mann alleges this change in Hahn's testimony worked a constitutional violation, essentially arguing both a constructive amendment and material variance occurred. We note that Mann did not preserve either his constructive amendment or variance theory at trial, so our review is for plain error. See United States v. Gavin, 583 F.3d 542, 546-47 (8th Cir. 2009). Applying this standard of review, we find no variance or constructive amendment occurred.

The difference between a variance and a constructive amendment "is well established, though at times difficult to apply." United States v. Adams, 604 F.3d 596, 599 (8th Cir. 2010). "A constructive amendment . . . occurs when the essential elements of the indicted offense are altered, either actually or in effect, after the grand jury has issued the indictment." United States v. Johnston, 353 F.3d 617, 623 (8th Cir. 2003) (per curiam). "'A constructive amendment primarily affects the defendant's Fifth Amendment right to indictment by a grand jury . . . .'" United States v. Renner, 648 F.3d 680, 686 (8th Cir. 2011) (quoting Adams, 604 F.3d at 599). "'[A] variance occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" Gavin, 583 F.3d at 547 (citation omitted). "[A] variance implicates the defendant's Sixth Amendment right to notice of the nature of the charge and is subject to harmless error analysis." Renner, 648 F.3d at 685 (quoting Adams, 604 F.3d at 599).

To the extent that Mann argues that he was convicted of a different crime than the crime for which the grand jury indicted him, Mann argues a constructive amendment occurred. Count 5 of the second superseding indictment charged Mann with violating 26 U.S.C. § 5861(d). The indictment listed the elements of the charge as "knowingly possess[ing]" a "7.62 caliber machinegun, serial number BM-0834, which was not registered to [Mann] in the National Firearms Registration and Transfer Record." Those were the same elements the Government sought to prove at trial and the same elements on which the jury was instructed. See Jury Instructions 23 and 24. Mann argues that the Government's theory of the source of the gun changed from its presentation to the grand jury and petit jury. A particular source of the gun was not an "essential element" of the offense; thus, a change in theories between presentations to the grand jury and the trial jury did not work a constructive amendment of the indictment. See Johnston, 353 F.3d at 623.

To the extent that Mann argues the evidence against him changed from the indictment stage to the trial stage, he argues that a variance occurred. However, the variance theory looks to whether the evidence at trial proves facts "'materially different from those alleged in the indictment.'" United States v. Buchanan, 574 F.3d 554, 564 (8th Cir. 2009) (citation omitted). The indictment alleged only that Mann possessed a machinegun with the serial number BM-0834. It did not allege that Mann obtained that gun from Hahn. Though Hahn testified before the grand jury that he probably provided the gun to Mann, we look to the indictment rather than to the grand jury testimony to determine whether a variance occurred. See Buchanan, 574 F.3d at 565. Here, the specific evidence presented at trial did not prove facts different from those alleged in the indictment. Thus, no variance occurred.

IV. Post Trial

*A. Sentencing*

Mann contends the district court made four procedural errors in calculating his Sentencing Guidelines range. See United States v. Cunningham, 593 F.3d 726, 730 (8th Cir. 2010) (indicating error in assessing sentencing enhancements is procedural error). First, Mann argues that the district court erred in applying the cross-reference for attempted murder contained in United States Sentencing Commission, Guidelines Manual, §2A2.1. Second, Mann argues the district court erred in finding that Dr. Pierce was an official victim as defined by Guidelines section 3A1.2. Next, Mann argues the district court erred in applying a two-level enhancement for possessing stolen firearms and in finding the grenades had an altered or obliterated serial number pursuant to Guidelines section 2K2.1(b)(4). Finally, Mann argues the district court erred in applying a two-level enhancement for obstruction of justice for directing the assault of a federal inmate pursuant to Guidelines section 3C1.1. We will address each argument in turn.

*i. Bombing and Arson Charges*

The Sentencing Guidelines for crimes involving weapons of mass destruction instruct the court to apply a cross-reference for attempted murder where the offense was "tantamount to attempted murder." U.S.S.G.§2M6.1(c)(2). The cross-reference, found at section 2A2.1, sets a base level of 33 for any assault that would have constituted first degree murder had the victim died as a result of the assault. U.S.S.G. §2A2.1(a)(1). The district court applied this cross-reference to Mann. Mann argues the district court erred in applying the cross-reference because the bombing was not tantamount to attempted murder because there was no evidence that the bomb was intended to kill Dr. Pierce. Mann relies on the testimony of a former arms dealer,

Lloyd Hahn, who testified that MK3A2 grenades are designed to disable rather than to kill.

We review a district court's factual findings for clear error. United States v. Tunley, 664 F.3d 1260, 1262 (8th Cir. 2012). The sentencing court need only find facts for sentencing purposes by a preponderance of the evidence. See id.

At trial, Stephen Shelley, one of the Government's explosives experts, testified that an MK3A2 is designed to cause casualties. Additionally, Dean Fitzgerald, a bomb technician, testified that the type of grenade used in the bombing is "almost guaranteed" to kill any individual within a closed-in area where it explodes. Additionally, the Government put on ample evidence of the life-threatening nature of Dr. Pierce's injuries and the numerous and extensive surgeries that were necessary to sustain his life. Evidence of the nature of a bombing can demonstrate an intent to kill. Cf. United States v. Warbonnet, 750 F.2d 698, 700 (8th Cir. 1984) (per curiam). We find that it was reasonable for the district court to determine that the explosion was intended to kill Dr. Pierce and that it was tantamount to attempted first-degree murder. Thus, the court did not err in applying the cross-reference.

Mann was also given a six-level sentencing enhancement for the bombing and arson charges because Dr. Pierce was an official victim under Guidelines section 3A1.2(a). The enhancement is applied where a victim is "a government officer or employee." U.S.S.G. §3A1.2(a). Mann contends Dr. Pierce was a private individual and not an official victim because the Board is not funded by the State of Arkansas. Because this is a challenge to the district court's application of law, our review is de novo. United States v. Bahena, 223 F.3d 797, 804 (8th Cir. 2000).

Though the Board receives no money from the State, it is tasked with credentialing medical professionals to practice in Arkansas and is tasked with

disciplining those doctors.  The protection of public health through the police power is a traditional state function.  See Women's Kan. City St. Andrew Soc. v. Kansas City, 58 F.2d 593, 599 (8th Cir. 1932) (stating the police power was originally "exercised in the interest of public health, safety, peace, and morals").  The Board carries out that function by supervising the State's medical community, which is essential to assuring the health of the citizenry of the State of Arkansas.  The powers of the Board are assigned to it by the State's legislature.  See Ark. Code Ann. § 4-29-309.  Though the Board is not financed by the State, it carries out the work of the State; thus, its members are officials of the State government.  We have held that the official-victim enhancement applies to state government officials.  United States v. Stewart, 20 F.3d 911, 918 (8th Cir. 1994).  The evidence indicated that Dr. Pierce was targeted for his role on the Board.  As such, Dr. Pierce was an official victim under the Guidelines, and we find the district court did not err in assessing this enhancement.

Finally, Mann was given a two-level sentencing enhancement for the bombing and arson charges based on directing the assault of a federal inmate under Guidelines section 3C1.1 for obstruction of justice.[16]  Mann argues the district court erred in assessing this enhancement.  The only reference in the record to Mann ordering the assault of a federal inmate is contained in a bench conference that occurred at trial between the district judge and the attorneys.  The Government's attorney stated that an inmate had been assaulted by an associate of Mann, and the judge stated that he was aware that an assault had been threatened but was unsure of whether the assault had occurred.  Mann objected to the Presentence Investigation Report (PSR)'s inclusion of an enhancement based on the assault prior to the sentencing hearing.  No evidence

---

[16]The Government encourages this Court to find the enhancement for obstruction was appropriate based on the evidence that Mann obstructed justice by intimidating witnesses and destroying documents regarding the grand jury investigation.  However, the district court clearly entered the enhancement based on the alleged assault of an inmate.

was admitted at the hearing or at trial indicating whether an assault even occurred or whether it was ordered by Mann.

"The PSR is not evidence. If the defendant objects to any of the factual allegations contained therein on an issue on which the government has the burden of proof, such as . . . enhancing factors, the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." United States v. Poor Bear, 359 F.3d 1038, 1041 (8th Cir. 2004) (internal citation omitted). The Government submitted no evidence to support the court's finding that Mann ordered an assault on an inmate. Thus, the two-level enhancement based on that assault was improperly entered, and we remand Counts 1 and 2 for resentencing.

*ii. Firearms Charges*

Next, Mann contends the district court erred in assessing an enhancement under Guidelines section 2K2.1(b)(4) for possession of grenades containing an altered serial number. We agree with Mann that the court erred in this assessment. The Government's witness Stephen Shelley testified on cross examination that grenades do not have serial numbers. Instead, the grenades have lot numbers that identify them as part of a group, rather than individually. The testimony indicated that many of the lot numbers and manufacturing dates had been removed from the grenades found near Mann's property. The sentencing enhancement applies only to firearms which once possessed a serial number which has been removed; it does not apply to firearms that were never equipped with a serial number. United States v. Bakhtiari, 913 F.2d 1053, 1063 (2d Cir. 1990). Accordingly, the enhancement was applied in error.[17]

---

[17]The enhancement for obliterated serial numbers increased Mann's offense level by four levels, which would have resulted in a sentencing level of 32 for the firearms group. However, the Guidelines cap the sentencing level for firearms offenses at 29, unless the offense involved a rocket or a missile. See U.S.S.G.

The district court also erred in assessing an enhancement for stolen firearms under section 2K2.1(b)(4) based on the 98 40mm grenades. No evidence was presented that indicated the 98 grenades had been stolen. Instead, two of the Government's witnesses testified that in prior, unrelated incidents grenades somewhere were stolen by someone. First, Steven Shelley testified that he had been involved in many ATF investigations where military grenades were stolen and wound up in civilian hands. Second, Thao Dinh Le, an arms collector, testified that he purchased grenades that were rumored to have been stolen. That was the entirety of the evidence indicating that the grenades might have been stolen. Lloyd Hahn testified that the grenades he sold Mann were purchased from Tom Owsley, who had purchased them from the National Guard, indicating they had not been stolen. The Government conceded prior to sentencing that it had not proven the grenades were stolen; nevertheless, the district court applied the enhancement. The application of the enhancement was not harmless, and we must remand for resentencing as to the firearms offenses.[18]

---

§2K2.1(b)(4). Accordingly, Mann's sentencing level for the firearms offenses was capped at 29, before the enhancement for obstruction of justice was applied. Because Mann was erroneously assessed a four-level enhancement and his sentencing level exceeded the cap by only three levels, this enhancement was not harmless because it increased Mann's sentencing level for the firearms group by at least one level.

[18]At the time of sentencing, the enhancement was harmless because it was a two-level enhancement, and Mann's offense level was three steps higher than the cap of 29. However, when the four-level enhancement for removed serial numbers is removed at resentencing, the addition of the two-level enhancement for stolen firearms will no longer be harmless. For that reason, we remand for resentencing as to Counts 3 and 5 or 6.

## B. Cumulative Error

Mann argues that we should reverse based on cumulative error. "'We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal.'" United States v. Anwar, 428 F.3d 1102, 1115 (8th Cir. 2005) (quoting United States v. Riddle, 193 F.3d 995, 998 (8th Cir. 1999)). "This court will not reverse based upon the cumulative effect of errors unless there is substantial prejudice to the defendant." Id. After reviewing the record, we reject Mann's argument. The cumulative effect of the claimed errors did not deny Mann a fair trial.

## V. Conclusion

We affirm Mann's convictions as to Counts 1, 2, 3, 7, and 8. We remand Counts 5 and 6 with instructions to set aside one of the convictions. We affirm the sentence as to Counts 7 and 8 but remand Counts 1, 2, 3, and 5 or 6 for resentencing.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's affirmance of Mann's conviction on Count II because the government failed to adduce sufficient evidence that Dr. Pierce's vehicle was used in interstate commerce or affected interstate commerce. I otherwise concur in the majority opinion.

The government failed to introduce sufficient evidence to convict Mann of maliciously damaging a vehicle used in interstate commerce, in violation of 18 U.S.C. § 844(i). To convict Mann of maliciously damaging Dr. Pierce's vehicle, the government needed to prove that Mann (1) damaged or destroyed a vehicle by means

of an explosive, (2) he did so maliciously, and (3) the vehicle was used in interstate commerce or an activity affecting interstate commerce. *See* 18 U.S.C. § 844(i). Mann argues that the government introduced insufficient evidence to show that Dr. Pierce used his vehicle in interstate commerce or in an activity affecting interstate commerce. In response, the government argues that Dr. Pierce's driving his vehicle from his home in West Memphis, Arkansas, to his work place in Little Rock, Arkansas, affected interstate commerce.

To "be 'used' in an activity affecting commerce," the vehicle must be "activel[y] employ[ed] for commercial purposes, and not [have] merely a passive, passing, or past connection to commerce." *Jones*, 529 U.S. at 855. In *Jones*, the Supreme Court answered whether "property occupied and used by its owner not for any commercial venture, but as a private residence. . . .[i]s . . . , in the words of § 844(i), used in . . . any activity affecting . . . commerce." 529 U.S. at 854 (quotation omitted) (fourth and fifth alteration in original). In answering this question, the Court noted that "[t]he key word is 'used.' Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce . . . ." *Id.* (quotation and citation omitted). Instead, "Congress required that the damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce." *Id.* (quotation, alteration, and citation omitted). Similarly, in this case, "[t]he proper inquiry . . . is into the function of the [vehicle] itself, and then a determination of whether that function affects interstate commerce." *Id.* (quotation, citation, and footnote omitted). While

> § 844(i) excludes no particular type of [vehicle] (it covers "any [vehicle]")[,] the provision . . . require[s] that the [vehicle] be 'used' in an activity affecting commerce. That qualification is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce. Although variously

defined, the word "use," in legislation as in conversation, ordinarily signifies active employment.

*Id.* at 855 (quotations and citations omitted).

In a factually analogous case, the Tenth Circuit found a similar argument to that of the government's insufficient to satisfy the interstate commerce requirement of § 844(i). In *United States v. Monholland*, defendants conspired to place an explosive device on an Oklahoma state court judge's vehicle. 607 F.2d at 1312. The government alleged that the defendants violated § 844(i). Regarding the interstate commerce prong of § 844(i), the government theorized "that the vehicle was used in interstate commerce or in an activity affecting interstate commerce. . . . [because] the judge's pickup [w]as a vehicle which [wa]s regularly used in and as a part of activity affecting interstate commerce." *Id.* at 1314. The Tenth Circuit rejected the government's argument and found that the vehicle was not "used" in interstate commerce, stating:

> The vehicle in question was not even used on official business. It was used to transfer the judge to and from work. The important problem here is that movement to and from work is an activity which ordinarily has an existence independent from the work. It does not blend into and become a part of the career. If a connection is to be established between the vehicle and the work, it must be shown that there exists a nexus between the two activities. Here the activities are independent.
>
> The evidence here is that the function of the truck is to get the judge back and forth, and if the truck fails he would find some other means to accomplish the trip. We say, then, that the truck is wholly immaterial as far as any commerce is concerned even if we assume that there is a commerce quality about what the judge does after he gets to court. . . . Since [the vehicle] is divorced from the activity carried on in court, there is no legal relationship whereby one can say that the truck affects commerce. . . . Our view has to be that, in law, the activity of the

-57-

judge at the courthouse is remote from the use of the truck. The truck does not enter into the administration of justice in the slightest degree.

*Id.* at 1316.

Similarly, here, the Board's ability to affect interstate commerce does not convert Dr. Pierce's personal vehicle into an item "used" in interstate commerce.[19] Section 844(i) requires this court to look at "the function of the [vehicle] itself," not Dr. Pierce's role as a member of the Board. *Jones*, 529 U.S. at 854. The government's argument focuses on the Board's effect on interstate commerce; yet, it ignores that the object of the crime for purposes of § 844(i) is the *vehicle*. Thus, the *vehicle* itself, not the Board's activities, has to affect interstate commerce. In my view, "[w]ere we to adopt the Government's expansive interpretation of § 844(i), hardly a [vehicle] in the land would fall outside the federal statute's domain." *Id.* at 857. Under the government's view, a person who regularly drives his or her own private vehicle intrastate to any company or nonprofit organization would satisfy the "used" requirement of § 844(i).[20] Thus, "[I] conclude that § 844(i) is not soundly read to make virtually every arson in the country a federal offense" and would therefore "hold that the provision covers only property currently used in commerce or in an activity affecting commerce." *Id.* at 859.

---

[19]The majority correctly notes the distinction between 18 U.S.C. § 2332a and 18 U.S.C. § 844(i): "Proving a violation of Count 2 requires proof of an element required in Count 1: specifically, in Count 2, the vehicle itself must be *used* in interstate commerce, rather than the lesser requirement that the offense *affect* interstate commerce found in Count 1."

[20]This is especially true here, where the not-for-profit Board focuses on licensing of physicians only in Arkansas. Under the government's reasoning, any private vehicle used to transport a worker to a commercial enterprise would necessarily be included within § 844(i)'s reach.

The majority also notes that "[t]he vehicle's function was not only to transport Pierce to Board meetings and other trips made on behalf of the Board, but it was also used to transport Board files to the meetings, instead of shipping them." It contends that Dr. Pierce's use of his personal vehicle to attend Board meetings is analogous to the victim's use of his vehicle as a traveling union organizer in *Michaels*, 726 F.2d 1307. But that case is distinguishable. In finding that the government satisfied the jurisdictional requirement in *Michaels*, we said:

> The government's uncontradicted evidence sufficiently demonstrates that the Cadillac automobile was used by [the victim] to conduct union business. [A witness], testified that [the victim] was employed by the union as a field organizer. In this capacity, [the victim] traveled to various job sites for the purpose of enrolling new members in the union and collecting money owed the union by current members. The union paid [the victim] a $200 per month allowance as reimbursement for using his personal automobile to conduct union business. *Clearly, use of the automobile was an integral and necessary part of [the victim's] job assignment and was not merely a means of traveling to and from work.*

*Id.* at 1310 (citation omitted) (emphasis added). In *Michaels*, it was a part of the victim's duties to "travel[] to various job sites for the purpose of enrolling new members in the union and collecting money owed the union by current members." *Id.* In contrast, here, Dr. Pierce's vehicle was not an "integral and necessary part of [his] job assignment." *Id.* Rather it was "merely a means of traveling to and from [Board meetings]." *Id.* The Board's reimbursement of Dr. Pierce for his intrastate travel and his transport of files does not convert Dr. Pierce's personal vehicle into one that he "used in commerce or in an activity affecting commerce." *Jones*, 529 U.S. at 854

(quotation and citation omitted). Dr. Pierce's attendance at Board meetings—not his means of transportation—was an integral part of his work.[21]

For the forgoing reasons, I respectfully dissent in part.

_____

[21] In *Jones*, the Court rejected a similar argument by the government when it argued that a private residence fell within § 844(i)'s jurisdiction because it received natural gas from outside of the state. 529 U.S. at 855–56.