**UNITED STATES, Appellee,**

v.

**Leroy Lloyd LAME, Appellant.**

**No. 83–1063.**

United States Court of Appeals,
Eighth Circuit.

Argued June 17, 1983.

Decided Aug. 31, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 18, 1983.

James D. Leach, Rapid City, S.D., for Mr. Lame.

Philip N. Hogen, U.S. Atty., D.S.D., Reed Rasmussen, Asst. U.S. Atty., Rapid City, S.D., for appellee.

Before HEANEY, Circuit Judge, and GIBSON and ROSENN,* Senior Circuit Judges.

ROSENN, Senior Circuit Judge.

Leroy Lloyd Lame was tried to a jury in the United States District Court and convicted of involuntary manslaughter for the death of his girlfriend, Lavina Ardith Two Bulls. Lame appeals his conviction, challenging the validity of the indictment, the failure of the trial court to suppress Lame's statement to FBI agents, and several trial court rulings. We affirm.

## I

Leroy Lloyd Lame (Lame), a fifty-six year old native American, spent Thursday, April 22, 1982, on the Pine Ridge Indian Reservation "drinking" with his girl friend, Lavina Ardith Two Bulls (Lavina). Late in the day, Lame and Lavina returned to the home of Lame's mother, who was out of town. At the house they were joined by a mutual friend, Oscar Blackstone (Oscar), in whose company they continued to drink. After a time, Lame went off to pick up his brother Charles and his brother's girl friend, Josephine Afraid of Bear (Josephine). When Lame returned with Charles and Josephine, he found Lavina in bed with Oscar. Both Lavina and Oscar were extremely drunk. Oscar fled the room, leaving Lavina with Lame.

Lame grabbed Lavina by the throat, shook her, and slapped her. She fell out of bed, and in doing so struck her head on the floor. When Lame pulled Lavina back up on the bed, she apparently had a seizure. Lame apparently thought nothing of this since Lavina often had seizures when she drank. After Lavina recovered from the seizure, she began to pull Lame's hair, biting and kicking him. He then hit her many times with the heel of his hands, and struck her with his fist.

The morning following the incident (Friday, April 23), Lame went into town with Charles, Oscar, and Josephine to buy more wine. Lavina did not feel well and Lame asked whether she wanted to go to the hospital. She replied in the negative. Later that evening, Lavina suffered a seizure or a stroke. She had convulsions and apparently bled from the nose or mouth. Lame asked Josephine to get Lavina a wet towel, which she did. At this time, Josephine looked into the bedroom and observed that Lavina was apparently conscious. On Saturday, Lame, Charles, Josephine, and other relatives and companions continued to

* Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

drink. By Saturday night, Lavina was breathing very heavily. One Julie Warrior, the girl friend of Lame's nephew, slept at Lame's mother's house that night and heard Lavina's heavy breathing and a strange noise coming from her throat. Julie did not, however, take any action because she believed that Lame was in the bedroom with Lavina and would take care of her. Sunday morning, Lavina was dead. Lame fled the house. The other people sleeping in the house discovered Lavina's body and called the police shortly before 10:00 A.M. Sunday morning.

Lavina's body was taken to Pine Ridge Hospital. A medical examination and autopsy revealed that she probably died between 3:00 A.M. and 5:00 A.M. on Sunday morning from a subdural and subarachnoid hemorrhage (a slow hemorrhaging on the surface of the brain). Two forensic pathologists testified that the primary cause of death was "blunt force trauma" to the head. The nature of the hemorrhage was such that it was almost certainly caused by Lavina striking her head on the floor. Aside from the fatal hemorrhage, Lavina's autopsy revealed only bruises. There was sufficient medical testimony from which the jury could infer that because of the type of injuries the decedent sustained, the injuries that she incurred on Thursday night could have caused her death on Sunday morning. Prompt medical attention for the decedent's head injury might have saved her life.

While Lavina's body was being taken to Pine Ridge Hospital, tribal police searched for Leroy Lame. The police apprehended him in the early afternoon at the Sioux Nation Shopping Center. Lame appeared to be intoxicated, so the police arrested him for drunkenness and disorderly conduct. He was arraigned the next day on this charge, pled guilty, and the court sentenced him to pay $12.50 in court costs and a $10 fine. The judge then explained to Lame that he had three choices: he could pay immediately; receive a stay of execution until the fine was paid; or work the fine off at a rate of either $3 or $6 a day. Lame did not offer to pay the fine or request a stay of execution; he was thereupon returned to jail.

Later that afternoon, two agents from the Federal Bureau of Investigation (FBI), arrived to interview Lame concerning Lavina's death. The tribal policeman who originally arrested Lame was also present. Lame signed a valid *Miranda* waiver, and proceeded to describe the events on the day of the assault. He then went on to describe the events of Friday morning. He said that before he went out for more wine, he asked Lavina whether she wanted to go to the hospital. At this point, one of the FBI agents brought the conversation back to the facts of the assault. The FBI agent stated that he didn't believe that Lame merely hit Lavina with his hands, but with a baseball bat. Lame became angry, denied using the bat, and said, "If you don't believe me maybe I should get a lawyer." The agents made no reply to this remark and after a short pause Lame resumed his narrative. He then went on to describe the events of the next two days during which he alternately went out drinking and returned to the house to care for Lavina until she eventually died.

The defendant was indicted for second degree murder in violation of 18 U.S.C. §§ 1153 and 1111. The jury acquitted him of second degree murder, but convicted him of the lesser included offense of involuntary manslaughter. Trial Judge Bogue sentenced Lame to three years imprisonment.

## II.

On appeal, defendant's first challenge is to the validity of his indictment. He offers two distinct arguments.

## A.

First, Lame asserts that his indictment was facially inadequate in that it did not clearly allege second degree murder. This argument is patently frivolous. The indictment read as follows:

> On or about the 22nd day of April, 1982, at Oglala, in Indian country, in the District of South Dakota, Leroy Lloyd

Lame, an Indian, did unlawfully beat and strike Lavina Ardith Two Bulls, a/k/a White Magpie, a/k/a Running Hawk, and as the result . . . [she] did die on or about the 24th or 25th day of April, 1982. Thus, Leroy Lloyd Lame did unlawfully and with malice aforethought, murder a human being, Lavina Ardith Two Bulls . . . in violation of 18 U.S.C. §§ 1153 and 1111.

■■■ An indictment is sufficient if it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and, "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). The elements of second degree murder, for purposes of crimes committed on Indian lands within the Eighth Circuit, are (1) the unlawful taking of a human life with (2) malice aforethought. *Beardslee v. United States,* 387 F.2d 280, 293 (8th Cir.1967). Lame's indictment alleges both elements of second degree murder. It is sufficiently specific as to time and place to pinpoint the incident complained of and avoid double jeopardy problems. Therefore, the indictment is facially adequate.

### B.

Second, the defendant complains that the district court refused to order disclosure of the grand jury transcripts to him. Prior to the commencement of the grand jury proceedings, defense counsel sent the United States Attorney a list of exculpatory facts that he believed should be presented to the grand jury. These included information that Lame and Lavina had been lovers for at least a year before the fatal incident, that Lame found Lavina in bed with Oscar, that Lame attended to Lavina over the weekend, and that apparently none of the people who were in the house over the weekend thought that Lavina was ill enough to have to go to the hospital. In the district court Lame contended that the United States Attorney never presented this information to the grand jury, for if he had, the grand jury would not have indicted Lame for second degree murder. Therefore, he sought access to the grand jury transcripts for the purpose of showing that the exculpatory information had not been imparted to the grand jury, and that the indictment should therefore be dismissed.

■■■ The court rejected Lame's request for access to the grand jury transcripts because he did not demonstrate the particularized need required by Fed.R.Crim.P. 6(e)(3)(C)(ii). We agree. "The grand jury possesses broad investigative power to enable it to carry out this [accusatorial] function. It may compel production of such evidence and testimony as it considers appropriate, 'unrestrained by the technical procedural and evidentiary rules governing the conduct of the criminal trials.'" *United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir.1979) (quoting *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974)). In guiding the progress of the grand jury, the United States Attorney may not engage in fundamentally unfair tactics or deliberately mislead the jury. He may not, for instance, introduce evidence that he knows to be perjured, or conceal substantial evidence negating guilt. *Id.* at 623. At the same time, the United States Attorney is not obliged "to search for and submit to a grand jury evidence favorable to the defense or negating guilt, when it has not been requested by the grand jury." *Id.* at 622. The grand jury proceeding is not an adversary hearing or "mini-trial" at which the defendant is entitled to present his version of the facts. *Id.*

■■■ A criminal defendant must point to specific evidence of prosecutorial overreaching in order to show particularized need to consult grand jury transcripts. A defendant who "has not pointed to anything in the record which might suggest that the prosecution engaged in improper conduct before the grand jury" has not carried his burden of persuasion. *United States v. Edelson,* 581 F.2d 1290, 1291 (7th Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59

L.Ed.2d 456 (1979). Lame has not directed our attention to any evidence suggesting that the United States Attorney's conduct before the grand jury violated his rights. As previously noted, the defendant was not entitled to have his case presented in a "mini-trial" before the grand jury. Furthermore, it is highly likely that Lame's many friends and relations who testified before the grand jury presented a picture of the fateful weekend that was sympathetic and fair to Lame.

The district court enjoys "substantial discretion" in deciding grand jury disclosure questions. *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 223, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1970). Under the circumstances, we do not believe that the district court abused its discretion in this case.

### III.

Lame next argues that the trial court committed reversible error by denying his motion to suppress his statement made to FBI agents on Monday, April 26. He asserts that his statement was tainted for three reasons. First, his original arrest for drunkenness was pretextual. Second, at the time that he made his statement he was being punished for indigency in violation of the United States Constitution. Third, his request for a lawyer made during the course of his interrogation was ignored. After examining the record in this case, we conclude that none of these three claims has legal merit.

### A.

Lame urges that his arrest for drunkenness and disorderly conduct was pretextual, and that his subsequent statement, made while he was still in custody, was therefore subject to suppression under *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).

We agree that Lame may indeed originally have been arrested on pretext. The tribal policeman who located Lame on the afternoon of Sunday, April 25, testified that he sought Lame because he wanted to talk to him about Lavina's death, but when he found him, Lame was intoxicated "so I arrested him on a tribal charge of disorderly conduct, drunk." It is quite possible that the policeman would not have arrested Lame for drunkenness had he not wished to question Lame concerning Lavina's death. But it is also possible that having found Lame drunk, the policeman would have arrested Lame for drunkenness even if he had no need to question him for another crime.

 Assuming without deciding that Lame's original arrest for drunkenness was indeed pretextual, it does not necessarily follow that his statement was subject to suppression. If the taint of the pretextual arrest was purged by a subsequent event occurring prior to Lame's interrogation, then the statement is rendered admissible. Language found in Justice Powell's concurring opinion in *Brown v. Illinois,* 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1974), the very section of *Brown* upon which Lame himself relies, states that an "accused's presentation before a magistrate for a determination of probable cause" purges the taint of an illegal arrest. If presentation before a magistrate for the determination of probable cause purges the taint of a pretextual arrest, then, *a fortiori,* presentation before a tribal judge must purge the taint of an allegedly pretextual arrest where the defendant pleads guilty to the crime originally charged and the judge imposes sentence. At the time of his interrogation, Lame was being held not pursuant to his original arrest, but rather pursuant to a subsequent valid conviction. We therefore hold that the district court properly declined to suppress Lame's statement as the fruit of a pretextual arrest.[1]

---

1. We further note that even if the taint of any pretextual arrest was not purged by the proceeding in tribal court, Lame's statement would probably still have been admissible. Under the

Supreme Court's recent decision in *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), a confession obtained following an illegal arrest is subject to suppres-

## B.

■ Lame next contends that his statement should have been suppressed because at the time that the statement was made, he was being held on account of his indigent status in violation of his constitutional rights as defined by the cases of *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), and *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). Lame misreads *Tate* and *Williams.* Those cases merely hold that a criminal defendant may not be incarcerated for any period in excess of the maximum period authorized by statute because the defendant is unable to pay a fine or court costs. They do not hold that "[t]he mere fact that an indigent in a particular case may be imprisoned for a longer time than a non-indigent convicted of the same offense" gives rise to an equal protection violation. *Williams, supra,* 399 U.S. at 243, 90 S.Ct. at 2023. As Chief Justice Burger succinctly stated in *Williams:* "[O]ur holding does not deal with a judgment of confinement for nonpayment of a fine in the familiar pattern of alternative sentence of '$30 or 30 days.'" *Id.*

In the case *sub judice,* the tribal judge sent Lame back to jail to work off his $22 fine at the rate of $3 or $6 a day. At this rate he could not have been confined for more than a week. Inasmuch as Oglala Sioux Tribal Code § 74 Class D (Drunk and Disorderly—appearing in public in an intoxicated condition) authorizes a maximum term of 30 days imprisonment, Lame's sentence did not violate the strictures of *Williams* and *Tate.*

## C.

Finally, Lame contends that his statement should have been suppressed because the police violated his *Miranda* rights by continuing their interrogation after he requested counsel. Lame relies upon the case of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* holds that when an "accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484, 101 S.Ct. at 1884 (footnotes omitted). *Edwards* does not, however, prohibit the accused himself from initiating further communication after he has invoked his right to counsel; it merely prohibits the police from taking the initiative by soliciting further communication.

> [A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

*Id.* at 484–85, 101 S.Ct. at 1884–85 (emphasis supplied).

The Court continued:

> In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.

*Id.* at 485–86, 101 S.Ct. at 1885.

■ Assuming *arguendo* that Lame's remark that "maybe I should get a lawyer,"

sion only where the police misconduct was flagrant and purposeful. We are aware of no

flagrant and purposeful police misconduct here.

constituted a request for counsel,[2] a question still remains as to whether the police solicited the balance of Lame's statement or whether he offered it spontaneously. We believe that Lame offered the balance of his statement spontaneously; it therefore is not subject to suppression under *Edwards v. Arizona.* When Lame stated that "maybe [I] should get a lawyer," the FBI agents remained silent. They did not continue to interrogate or attempt to persuade Lame to forego counsel. Lame quickly resumed his narrative on his own initiative without any prompting from the agents. This indicates that even if Lame had requested counsel, he soon changed his mind and decided to go forward with his statement.

We do not believe that the police violated Lame's constitutional rights by remaining silent for a few moments rather than taking the initiative to remind Lame that he could stop talking and was entitled to counsel. The *Miranda* waiver that Lame signed clearly indicated that he could stop talking at any time. Furthermore, Lame's very remark demonstrates his understanding that he could stop and demand counsel in mid-stream. As previously alluded to in *Edwards,* nothing in the fifth and fourteenth amendments would prohibit the agents from merely listening to Lame's "voluntary, volunteered statements and using them against him at the trial." Even if we were to suppose that the FBI agents' silence amounted to "subtle compulsion," this would not necessarily vitiate the voluntariness of Lame's subsequent statements. *See Rhode Island v. Innis,* 446 U.S. 291, 303, 100 S.Ct. 1682, 1691, 64 L.Ed.2d 297 (1980). We therefore reject Lame's request that we suppress his statement under the rule of *Edwards v. Arizona.*

### IV.

▪ Lastly, Lame contends that the trial court committed reversible error by refusing to admit evidence of his chronic alcoholism. Lame sought to introduce this evidence for the purpose of showing that the reason that he did not seek medical help for Lavina after the assault was not because of ill will towards her, but because he was unable to stop drinking and focus all of his attention on Lavina's condition. We believe that this evidence was properly excluded as irrelevant.

In *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the Supreme Court held that chronic alcoholics could properly be required to control their actions to the extent necessary to avoid collision with the criminal law, and that chronic alcoholism (as opposed to intoxication at the time of the crime) was therefore no defense to any crime—even the crime of public intoxication. Justice Marshall, writing for the plurality, stated:

> Traditional common law concepts of personal accountability and essential considerations of federalism lead us to disagree with appellant. We are unable to conclude, on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general ... suffer from such an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts
>
> . . . .

392 U.S. at 535, 88 S.Ct. at 2155. In the last analysis, the Court concluded that society simply could not afford to absolve any group of people from criminal responsibility for their actions.

Applying the rule of *Powell v. Texas* to the instant case, we conclude that Lame's chronic alcoholism in no way affected his duty of care toward the decedent. Evidence of his chronic alcoholism was therefore legally irrelevant and properly excluded.

Affirmed.[3]

---

**2.** An ambiguous statement of this sort may, under certain circumstances, be considered a request for counsel. *See McCree v. Housewright,* 689 F.2d 797, 801 (8th Cir.1982).

**3.** We also affirm the judgment of the district court denying defendant's motion for a subpoena requiring a witness to travel from Sioux Falls. Defendant's counsel asked the witness to come without first consulting the court. He

---

subsequently sought a subpoena in order to obtain reimbursement of the witness's expenses from the public fisc. *See* Fed.R.Crim.P. 17(b). The district court denied the subpoena, apparently on the ground that the witness's presence proved worthless. Under the law of the Eighth Circuit, district judges enjoy broad discretion to decide motions brought pursuant to Rule 17(b). *United States v. DeCoteau,* 648 F.2d 1191 (8th Cir.1981); *United States v. Gil-*

*liss,* 645 F.2d 1269 (8th Cir.1981). We cannot say that the trial judge abused his discretion by placing the cost of this unnecessary travel on defendant's counsel rather than on the taxpayer.