# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-3690

———————————————

United States of America

*Plaintiff - Appellee*

v.

Calmer Cottier

*Defendant - Appellant*

———————

Appeal from United States District Court
for the District of South Dakota - Rapid City

———————

Submitted: October 25, 2018
Filed: November 16, 2018

———————

Before WOLLMAN, LOKEN, and ERICKSON, Circuit Judges.

———————

ERICKSON, Circuit Judge.

In the early morning hours of July 12, 2015, Ferris Brings Plenty was murdered during a vicious group beating on the Pine Ridge Reservation in South Dakota. For his role in the beating, Appellant Calmer Cottier was charged with Second Degree Murder (or aiding and abetting the same), Conspiracy to Commit Assault, and Solicitation to Commit a Crime of Violence. A jury found Cottier guilty of the murder and conspiracy counts. Cottier was acquitted of the solicitation count. The

district court[1] sentenced Cottier to 210 months' imprisonment. Cottier raises five issues on appeal: (1) the sufficiency of the evidence on the second degree murder count, (2) the court's instruction to the jury on the elements of second degree murder, (3) improper vouching for the credibility of witnesses by the prosecution, (4) the admission of testimony concerning a sexual encounter that took place in the hours leading up to the murder, and (5) the calculation of his criminal history. We affirm.

## I.    Background

"We recite the facts in the light most favorable to the jury's verdict." United States v. Hemsher, 893 F.3d 525, 528 (8th Cir. 2018) (quoting United States v. Daniel, 887 F.3d 350, 353 (8th Cir. 2018)). On July 12, 2015, Cottier, Steven Steele, Terry Goings III, and Billy Bob Bluebird were in Bluebird's backyard in Pine Ridge, South Dakota. Some of the men were gang members, belonging to the Juggalos, a division of the Bloods. Aaron Little Bear and Fred Quiver, members of a competing gang, the Tre Tre Crips, were drinking in the adjacent Quiver backyard. Little Bear argued with Cottier, and the two groups exchanged gang-related slurs.

After the argument ended without a physical confrontation, Cottier and his group went to his grandmother Rose Cottier's ("Rose") house. There they were joined by Cottier's brothers Jerome Warrior and Albert Cottier ("Albert"). Angry that he got "punked out" when Little Bear argued with him and called him and his group names, Cottier suggested that the group go back to the Quiver residence to fight Little Bear.[2] As the men walked to the Quiver residence, they discussed weapons, Goings

_____

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota.

[2]This fact may be inconsistent with the jury's acquittal of Cottier on the solicitation count. In any event, according to every witness's story at trial, someone in the group suggested they go back to fight Little Bear either one-on-one or as a

gave his machete to Steele, and Goings found what the members described as "a stick" or a "rake handle." The group split into two to bum-rush the Quivers—Steele, Bluebird, and Warrior on one side of the residence and Cottier, Goings, and Albert on the other side.

When they arrived at the Quiver residence around 3:00 a.m., they did not encounter Little Bear. Instead, Brings Plenty was sleeping in a tent in the backyard. When Brings Plenty emerged from the tent and tried running away, Cottier threw a cinder block at his head, which struck him in the face and caused him to stumble.[3] Warrior tackled Brings Plenty to the ground. A vicious group beating ensued. Warrior and Cottier (and possibly Albert and Bluebird) kicked Brings Plenty several times while Goings hit him repeatedly with the stick and Steele struck him multiple times in the back of the head with the machete. Unsurprisingly, Brings Plenty died from his numerous blunt force trauma injuries.

## II. Discussion

### A. Sufficiency of the Evidence

We first address the issue of sufficiency of the evidence to sustain Cottier's conviction for aiding and abetting second degree murder. We review the "sufficiency

---

group, and Cottier went with the group as they left Rose's house for the Quiver residence.

[3] This fact was only attested to by Goings at trial. A factual basis statement from Steele's guilty plea that was admitted into evidence also mentioned the cinder block. However, a defense investigator, Ron Switzer, testified that on the Friday before trial, Steele told him in a jail interview that Cottier did not throw a cinder block and the factual basis statement was "bullshit." Photos from the scene showed a cinder block near Brings Plenty's body, but the medical examiner did not find any soot, cinders, or gravel in Brings Plenty's wounds.

of the evidence de novo, viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict." United States v. Kelly, 436 F.3d 992, 996 (8th Cir. 2006) (citing United States v. Dieken, 432 F.3d 906, 909–10 (8th Cir. 2006)). We will overturn the verdict only if no reasonable jury could have found Cottier guilty beyond a reasonable doubt. United States v. Skoda, 705 F.3d 834, 839 (8th Cir. 2013) (citing United States v. Gray, 700 F.3d 377, 378 (8th Cir. 2012)).

To convict Cottier, the jury had to find that: (1) he unlawfully killed Ferris Brings Plenty, or aided and abetted the killing; (2) he acted with malice aforethought; and (3) he is an Indian and the offense took place in Indian country. 18 U.S.C. §§ 1111 and 2. See also United States v. Lame, 716 F.2d 515, 518 (8th Cir. 1983) (listing the elements of second degree murder committed in Indian country). Malice may be shown "by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that [the factfinder] is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" United States v. French, 719 F.3d 1002, 1008 (8th Cir. 2013) (alteration in original) (quoting United States v. Black Elk, 579 F.2d 49, 51 (8th Cir. 1978)). "An aiding and abetting conviction requires the government to prove a defendant took an affirmative act to further the underlying criminal offense, with the intent of facilitating the offense." United States v. Borders, 829 F.3d 558, 565 (8th Cir. 2016) (citing Rosemond v. United States, 572 U.S. 65, 71 (2014)).

Cottier contends that no reasonable factfinder could have found that Cottier threw a cinder block at Brings Plenty based on the testimony of Goings. Cottier argues that Goings's testimony was not credible because his memory of the events was affected by his drunkenness and he testified pursuant to a cooperation agreement. "[W]e must resolve issues of credibility in favor of the verdict, and we decline to invade the province of the jury as [Cottier] would have us do." United States v. McCarthy, 97 F.3d 1562, 1571 (8th Cir. 1996) (first alteration in original) (quoting

United States v. Fregoso, 60 F.3d 1314, 1323 (8th Cir. 1995)). Goings's story was not so "internally inconsistent or implausible on its face" that the jury was not entitled to credit his testimony. United States v. Mann, 701 F.3d 274, 298 (8th Cir. 2012) (quoting Moore v. Novak, 146 F.3d 531, 535 (8th Cir. 1998)).

Even if we agreed that Goings's testimony about the cinder block was not credible as a matter of law, the jury easily still had before it ample evidence to find Cottier guilty of aiding and abetting second degree murder. Every witness who was able to identify the individuals involved testified about Cottier's active participation in the vicious group beating that killed Brings Plenty. Each witness recalled that after the group entered the Quiver yard with the intent to fight, Cottier repeatedly kicked Brings Plenty as others kicked Brings Plenty and struck him with a stick and machete repeatedly. As Cottier himself admitted at trial, it "wasn't a fair fight." This evidence is more than sufficient to prove beyond a reasonable doubt that Brings Plenty was killed in Indian country; Cottier, an Indian, knew the assault of Brings Plenty was being committed and aided in its commission; and Cottier acted recklessly and with wanton disregard of human life.[4]

---

[4]United States v. Grey Bear, 828 F.2d 1286 (8th Cir. 1987), *reh'g en banc granted in part, opinion vacated in part on other grounds*, 836 F.2d 1088 (8th Cir. 1987), and *on reh'g en banc*, 863 F.2d 572 (8th Cir. 1988), is distinguishable. The court in that case overturned second degree murder convictions of defendants who participated in a beating that stopped some unknown time before the victim was run over and killed by a co-defendant. Because of the lack of a known time sequence and knowledge that the victim was going to be run over, we said, "The only evidence that these defendants intended Peltier to die by their actions is that they beat him and left him on the highway. An equally strong inference to be drawn from the evidence is that these defendants had finished with Peltier and left him in the road when LaFuente independently ran over Peltier." Id. at 1296. The evidence in this case, on the other hand, is of a continuous group beating of such a nature that it was certain to—and did—lead to serious injury or death.

## B. Aiding and Abetting Second-Degree Murder Instruction

Cottier also appeals the district court's jury instruction number 4, which outlined the elements of second degree murder or aiding and abetting the same. "We review jury instructions for abuse of discretion, and '[i]n so doing, we do not consider portions of a jury instruction in isolation, but rather consider the instructions as a whole to determine if they fairly and adequately reflect the law applicable to the case.'" United States v. Pierce, 479 F.3d 546, 549 (8th Cir. 2007) (alteration in original) (quoting United States v. Turner, 189 F.3d 712, 721 (8th Cir. 1999)).

Cottier asserts that the instruction was erroneous and prejudiced him because "the jury was instructed to convict him of aiding and abetting second degree murder even if his intent was limited to that of an assault," which would violate circuit precedent. In Rosemond, 572 U.S. at 76 (citations omitted), we explained:

> [A] person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission. An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged . . . .

Similarly, in United States v. Roan Eagle, 867 F.2d 436, 445 (8th Cir. 1989), we said, "To be guilty of aiding and abetting is to be guilty as if one were a principal of the underlying offense. Aiding and abetting is not a separate crime but rather is linked to the underlying offense and shares the requisite intent of that offense."

Contrary to Cottier's assertion, however, the instruction did not allow the jury to convict him of aiding and abetting second degree murder by finding a mere intent to assault Brings Plenty. To convict Cottier of aiding and abetting the murder, the jury had to find that he "[a]cted willfully and with malice aforethought as those terms are referenced in element 2." The definition of "malice aforethought" in element two,

-6-

which tracks circuit precedent verbatim, made clear that Cottier had to possess "an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life." As such, the instruction linked the intent required to the killing, not just the assault. The district court did not abuse its discretion in providing an instruction that made clear that, as an aider and abetter, Cottier had to have the same intent of at least "callous and wanton disregard" as required if he were a principal of the underlying offense of second degree murder.

### C. Witness Vouching

Cottier next asserts that the government improperly vouched for the credibility of witnesses by (1) making two comments about Goings's truthfulness during closing arguments and (2) offering into evidence Goings's and Steele's plea packets, each containing a factual basis statement signed by the government. To warrant reversal for prosecutorial misconduct, Cottier must show: "(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected [Cottier's] substantial rights so as to deprive [him] of a fair trial." United States v. Jones, 795 F.3d 791, 799 (8th Cir. 2015) (quoting United States v. Wilkens, 742 F.3d 354, 361 (8th Cir. 2014)). Because Cottier did not object to the alleged prosecutorial misconduct, we "will reverse only if there is error that is plain and affects [his] substantial rights." Id. (citing United States v. Olano, 507 U.S. 725, 732 (1993)).

Cottier complains that the prosecutor commented twice during closing arguments about Goings's truthfulness. First, the prosecutor pointed out that Goings had provided information that "was corroborated, it was truthful -- excuse me -- it was corroborated." Later the prosecutor stated that while Goings admitted he had once lied to investigators, "when the time [came] to come clean he came clean, he told the truth." These comments do not constitute improper witness vouching. The

-7-

remarks were made to "explain why the jury might find [Goings] credible" based on the evidence before the jury and were not an attempt by the prosecutor to "put[] [her] personal reputation behind the testimony of [her] witnesses." Bass v. United States, 655 F.3d 758, 761 (8th Cir. 2011) (citing United States v. Bentley, 561 F.3d 803, 813 (8th Cir. 2009); United States v. Littrell, 439 F.3d 875, 882 (8th Cir. 2006)).

The admission of the factual basis statements into evidence is more problematic. The statements in question were written statements setting forth a factual basis signed by co-defendants Goings and Steele as part of their pleas of guilty. The factual basis statements are official court documents, signed by an Assistant United States Attorney and the respective co-defendant, that stated that "[t]he undersigned parties stipulate that the following facts are true." Cottier affirmatively consented to the admission of Goings's factual basis statement as part of a plea packet. Immediately after the admission of Goings's plea packet, the district judge instructed the jury that the United States still had to prove every element beyond a reasonable doubt, and the contents were not admitted for the truth of the matter asserted but instead to show the arrangements Goings had with the government. The prosecution did not read the factual basis statement to the jury or draw much attention to it. The defense, on the other hand, attacked the factual basis statement repeatedly on cross-examination and later had their investigator, Ron Switzer, actually read it to the jury.

Steele's factual basis was nearly identical to Goings's statement. Prior to the trial, Steele was interviewed by Switzer and indicated that parts of Goings's factual basis statement, particularly the part about the cinder block, was "bullshit." The defense attempted to call Steele as a witness to testify about his remarks to Switzer, but Steele invoked his Fifth Amendment right against self-incrimination in light of his own written factual basis statement. Once it became apparent that Steele would not testify, Cottier requested that he be allowed to offer the information Steele provided to Switzer by means of a recording of the conversation. The court allowed

Steele's jail interview to come in under Federal Rule of Evidence 804(b)(3). The government then expressed concerns about jury confusion if Cottier was able to present Steele's interview without the jury knowing what Steele had actually attested to in his own factual basis statement. The court in response allowed the government to place the factual basis statement into evidence and cross-examine Switzer about it. Cottier expressed no concerns about this approach of handling Steele's unavailability.

At the outset, we note that we find the way that factual basis statements are routinely used during trials in the Western Division of the District of South Dakota somewhat troubling. At hearing, we were led to believe that these statements are received into evidence as exhibits that are allowed to go to the jury during its deliberations. We caution that receiving sworn factual basis statements signed by lawyers into evidence and then allowing the statements in the jury room during deliberations without redaction of all but the testimonial portions of the documents and the pleading defendant's signature is not a favored practice. However, under the circumstances present here, the admission of the factual basis statements did not constitute reversible plain error. Cottier affirmatively consented to the admission of Goings's factual basis statement. After the court allowed Cottier to present Steele's jail interview through Switzer, Steele's factual basis statement was offered without defense objection because it was necessary to explain Steele's comment that the statement was "bullshit." Due to the overwhelming evidence of Cottier's guilt, Cottier also has not demonstrated that he was prejudiced by the admission of the factual basis statements.

### D. Testimony about "Training" Incident

The fourth issue raised by Cottier is whether the district court abused its discretion when it allowed testimony regarding a sexual act that took place in the sequence of events leading up to the murder. "Evidentiary rulings are reviewed for

abuse of discretion, and we afford deference to the district judge 'who saw and heard the evidence.'" United States v. Davidson, 449 F.3d 849, 853 (8th Cir. 2006) (quoting United States v. Ziesman, 409 F.3d 941, 951 (8th Cir. 2005)).

On direct examination, Goings testified that on the evening of July 11, 2015, sometime before the verbal confrontation at the Bluebird residence, a group of men participated in "training" a female in some bushes near Rose's house. "Training" is a term used by gang members to refer to taking turns having sex with a female. Defense counsel objected to this line of questioning once on grounds of leading the witness and twice on hearsay grounds, all of which were overruled. After several pages of testimony about the "training" incident, including that Cottier was present, defense counsel ultimately objected without specific grounds when the prosecutor asked Goings if Cottier told him that Cottier had "trained up" the girl. The district judge then told the jury, "Ladies and gentlemen, whatever this is, has nothing to do with the charges in the case. He is not charged with raping anybody, having sex with an underage child, or any such thing. Apparently this is some part of -- well, I'm not going to speculate."

The court called a bench conference. The government explained to the judge, who was unfamiliar with the "training" incident, that the evidence "goes to the gang mentality, the fact that they participated in a gang-related rape" and it "establish[es] the presence of other members of the conspiracy." Defense counsel argued that the evidence was not relevant and it was prejudicial to Cottier. The court responded:

> We will see how this sorts out. I will let it come in because you have done all this work on the gang thing, then the training business. It's probably all 403. You are going to bring it up anyway. So what [the AUSA] is doing is desensitize the jury to this whole matter or some other res gestae, is what Judge Battey used to call it. Everything was res gestae then. You let everything in as part of the events of the criminal enterprise.

-10-

I am going to caution him again he is not on trial for any of this. Since both sides intend to go into it, we will allow it.

Defense counsel clarified that he did not intend to go into the matter, to which the court responded, "Well, it's in now. If he is going to testify or not, your cross-examination is going to have broad latitude, I tell you that. Putting this in some kind of contest [sic] or demonstrating it is false, I don't know which way it is. See where it goes."

The court then instructed the jury:

Ladies and gentlemen, let me again tell you that Mr. Cottier is not on trial for any business about a sexual misdeed or rape or anything to do with this so-called training experience that the witness is testifying about. Just remember that.

The instructions said Mr. Cottier is on trial for Counts I, II, III, and not for anything else. So that is not that part of the case in terms of any element of the offense that has to be proven or any other matter, but if it's part of the events of the evening, I am allowing Ms. Poppen to go forward. Of course, Mr. Nelson can cross-examine.

During the mid-morning break, the parties again discussed the "training" testimony. The court explained that it had no means of knowing beforehand what the evidence was that was coming in, it is "always up to counsel to make objections or approach the bench to make a record," and "[i]f it comes up again or if there's some other matter on some other piece of evidence, [the defense should] feel free to object if [it] wish[es]."

After recross-examination of Goings ended, the court asked the parties to come to the bench out of a concern that the parties asked neither whether the "training" incident was consensual nor how old the female was. Without that information, the trial judge said, "[i]t makes it sound like [Cottier], according to [Goings], is having

-11-

sex with an underage girl" and "this was a felonious behavior." When the bench conference ended, the prosecution elicited testimony from Goings that the female was about 28 and she consented. Cottier later testified that Goings and Steele were the only ones having sex with the female, she was 32 or 33, and it was consensual.

Had the trial judge been alerted sooner to the nature of the "training" testimony, it appears the evidence would never have come in under the balancing test of Federal Rule of Evidence 403. The evidence was only minimally relevant, as a substantial amount of other testimony was elicited throughout the trial about the gang mentality and the existence of the conspiracy. The evidence meanwhile presented a great danger of creating unfair prejudice and misleading the jury about the actual charges Cottier faced. The probative value of this evidence was substantially outweighed by the danger of unfair prejudice.

Even so, reversal is not warranted. The record makes plain that before the appropriate objections and discussions took place, the evidence was already before the jury. It also is plain that the district judge was unaware of the nature of the evidence until it was presented in open court to the jury. Once this took place, the district judge did all he could to minimize the prejudice of the testimony. The judge twice instructed the jury that Cottier was not on trial for the "training" incident, gave Cottier wide latitude on cross-examination, and made the parties go back and ask Goings about the female's age and consent so that the jury was not left with the incorrect—and very prejudicial—impression that this was a felonious rape of an underage girl. On appeal, Cottier makes much of the first cautionary instruction, which included a reference to "sex with an underage child." Read in context, it is plain that at the time that the district judge gave the instruction, he was unaware of any underlying facts—all the judge knew was that the "training" had taken place. Any confusion was resolved when all the testimony and cautionary instructions had been received by the jury. Given the entirety of the record, there is no likelihood that the jury was misled or prejudiced by the evidence. Moreover, given the

-12-

overwhelming evidence of Cottier's active and enthusiastic participation in the brutal group beating of Brings Plenty, any error was harmless. See Lyons v. Luebbers, 403 F.3d 585, 597–98 (8th Cir. 2005) (concluding that where there is overwhelming evidence of a defendant's guilt, the improper admission of evidence constitutes harmless error).

### E.    Calculation of Criminal History

Finally, Cottier asserts that the district court erred when it assessed two criminal history points for his 2006 juvenile adjudication. We review the district court's Guidelines calculations *de novo* and its factual determinations for clear error. United States v. Small, 599 F.3d 814, 815 (8th Cir. 2010) (citing United States v. Yah, 500 F.3d 698, 702 (8th Cir. 2007)). "[W]hatever differences may exist between juvenile confinement and adult imprisonment, it is clear that juvenile sentences are considered in calculating criminal history." United States v. Stewart, 643 F.3d 259, 263 (8th Cir. 2011) (quotation marks and citation omitted). The district court properly assessed two points for the juvenile adjudication because Cottier's time in confinement after a 2011 revocation of his juvenile delinquency supervision exceeded sixty days and his release occurred within five years of the instant offense. See U.S.S.G. §§4A1.1(b)(2) (and application note 2), 4A1.2(d)(2)(A), and 4A1.2(k)(2). In any event, any error was harmless because the district court departed downward under U.S.S.G. §4A1.3(b)(1) to criminal history category I, placing Cottier in the same category that he would have been in without the assessment of the two points.

## III.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.[5]

_____

_____

[5]We grant Cottier's motion to correct a clerical mistake and allow his reply brief to have a file date of May 23, 2018.

-13-